# CASES

IN

# THE SUPREME COURT

OF

## PENNSYLVANIA.

## M'Elroy's Case.

Upon a traverse of the inquisition found upon a commission of lunacy, the question is whether the mind is deranged to such an extent as to disqualify the traverser from conducting himself with personal safety to himself and others, and from managing and disposing his own affairs and discharging his relative duties.

ERROR to the Common Pleas of *Allegheny* county.

This was a commission of lunacy taken out against Samuel M'Elroy and a traverse of the inquisition. On the trial the counsel for the traverser presented the following points for the court's instruction to the jury:

1. That the fact of Samuel M'Elroy being under a delusion upon some particular subjects, (if such be the case), is not sufficient to authorize the jury in finding him of unsound mind within the meaning of the Act of Assembly and Constitution of the State.

2. That the fact of Samuel M'Elroy being under such delusions in relation to some members of his family, as to lead him to ill treat and abuse them, is not sufficient to justify the jury in finding him of unsound mind as aforesaid.

3. That in order to justify such finding, there must be an entire unsoundness of mind, or, in the language of the Supreme Court,

he must be " wholly void of memory and understanding," and he must be entirely unfit for the management of his estate and for the care of his person.

4. That unless the jury believe that the traverser is so wholly deprived of understanding as to render him incapable of entering into any contract, that the law would regard the same as of no validity, and avoid it, in the absence of any proof of fraud or circumvention, their verdict should be for the defendant.

5. That if the jury believe, upon the whole evidence, that the mind of the traverser has heretofore and up to this time been sane in reference to the acquisition and transfer of property, and the proper care of it while in his possession, then their verdict must be for the defendant.

The relators requested the court to charge the jury: " That if they are satisfied from all the testimony in the cause that the traverser is of unsound mind, and is not capable of the government of himself and his property, they ought to find for the Commonwealth; and that to constitute unsound mind, it is not necessary that he should be insane on all or any specific number of subjects, or totally destitute of reason and intellect on all subjects."

PATTON (President). In England, by the common law, the king, who was *parens patriæ*, political father and guardian of the kingdom, was bound in a more peculiar manner to take care of all those who, by reason of their imbecility and want of understanding, were incapable of taking care of themselves; and by early statutes, the care of the persons and estates of idiots and natural fools, at first, and afterwards of lunatics, was made one of the prerogatives of the crown. The king took the profits of the idiot's estate to his own use, only allowing the idiot sufficient for the support of himself, and his family, when he had one. But before the king could enter on the lands or take possession of the property of the idiot, it was necessary that an inquisition should be held. For this purpose a commission was granted ,by the Lord Chancellor usually to five commissioners, empowering them to summon an inquest by writ to the sheriff, and inquire if the person be a lunatic, &c. If at the return of the inquisition any persons felt themselves aggrieved, formerly their only remedy was by petition to the king or *monstrans de droit*, but afterwards, by stat. 2 and 3 Edw. 6, c. 85 and 86, it was provided, that " if any person be untruly found an idiot or lunatic, every person aggrieved by such office or inquisition shall have their *traverse* to the same immediately, or after, and proceed to trial thereon, and have like remedy and advantage as in other cases of *traverse* upon untrue inquisitions or offices found." In Pennsylvania, the power exercised by the Court of Chancery (in England) over the estates of idiots and lunatics is vested in the Supreme Court, and several Courts of Common Pleas, by the Constitution of the State. This power has since been exercised by these courts in conformity with the prac-

tice and usages of the Court of Chancery. By the late Act of the 13th June 1836, the practice has been modified, in some few particulars, as, for instance, " the commission may issue to only one commissioner," " the inquisition may consist of only six members," &c. The 1st section provides, that every person aggrieved by any inquisition as aforesaid, may traverse the same upon or after the return of the same, and proceed to trial therein, and have like remedy and advantage as in other cases of traverse upon untrue inquisition or office found.

In this case an inquisition has been held, finding M'Elroy, a lunatic, a person of unsound mind and incapable of managing his own affairs. He alleges that he has been aggrieved, and traverses the finding; and the question for the jury to determine is, whether he is a person of unsound mind and incapable of governing himself or managing his affairs. In deciding this question, it is important to determine the meaning of the word " lunatic" under the late Act of Assembly. Until within a few years past, the most correct and comprehensive term used in the law, to include all sorts of mental unsoundness, was the phrase *" non compos mentis,"* meaning, says Littleton, of non-sane memory, or, as we would now translate it, " of unsound mind." This phrase, says he, is the most sure and legal, and includes all others, whether *amens, demens, furiosus, lunaticus, fatuus,* or *stultus.* Lord Coke also considers *non compos mentis* not only the legal, but the sure term, and divides it into four sorts. 1. An idiot, who from his nativity, by a perpetual infirmity, is *non compos mentis.* 2. He that by sickness, grief or other accident, wholly loseth his memory or understanding. 3. A lunatic, who hath sometimes his understanding and sometimes not. 4. A drunkard, who by his own vicious act depriveth himself of understanding.

The word " lunatic," which is now used as a generic term, was not used as such in ancient statutes or proceedings, the phraseology often used being " persons of unsound mind." It is derived from *luna,* and was brought into use through a vulgar error, though one of great antiquity, that persons subject to temporary or chronic insanity, epilepsy, &c. were somehow under the influence of the moon. Hence, even in the Greek, a language more ancient than the Latin, we find this sort of mental derangement or affection taking its name from the moon. A lunatic, therefore, according to former legal phraseology, signified one that had lucid intervals, sometimes not. In the Constitution of Pennsylvania, (Art. 5 § 6), the phrase used as the comprehensive and general one, is *non compos mentis.* But modern legislation has changed the relative legal philological use of the term lunatic, and has substituted it in the place of the old Latin phrase, *non compos mentis.* So that now, instead of denoting a species, it is the generic term in legislative technology for all sorts of mental unsoundness. The statutes of 11 Geo. 4, and 1 W. 4, declare that the word " lunatic" shall

extend to any idiot or person of unsound mind, or incapable of managing his affairs. The Act of 1836 uses the word lunatic in the same manner, in place of the old generic term in the common law and the Constitution; and section 67 enacts that the word " lunatic" in this Act shall be construed to mean and include every person of *unsound mind,* whether he may have been such from his nativity or have become such from any cause whatever.

The jury are therefore to inquire whether M'Elroy be a person of unsound mind or not; and if they believe him to be a person of unsound mind, it is their duty to say so, no matter from what cause the mental unsoundness proceeds. The existence of insanity is a fact which is best determined through the intervention of a jury. It presents a question which in many cases it is difficult to decide. Insanity exists in an endless variety of shapes and forms and degrees — from raving madness down to the slightest species of monomania. Eccentricity does not amount to insanity. A man may do the most extravagant things; he may recklessly squander his money; his conduct may be the subject of ridicule; he may be addicted to sudden bursts of passion and of harsh treatment towards those whom he should treat with tenderness; his deportment on a particular occasion may be an outrage upon decency and propriety. All this, if it be the result of eccentricity of character, or of depraved taste, or an unfortunate temper, and does not proceed from a permanent disorganization of the mental faculties, cannot fix upon a man the charge of insanity. Mere imbecility or weakness of mind is not insanity. You often hear the expression applied to a man " he is a very weak man," " he is a man of very weak mind." Because a man's mind may be weak compared with the more vigorous intellect of others, he is not therefore insane. Insanity, except in the case of idiots, who labour under a perpetual infirmity from their birth, implies a derangement in some shape or form of the intellect. It cannot be presumed from a single instance of unreasonable behaviour. It is a permanent affection of the mind.

3. We have been requested to charge the jury that to justify them in finding M'Elroy a person of unsound mind, they must believe him " wholly void of memory and understanding," and entirely unfit for the management of his estate and the care of his person. We are asked to say first, that nothing short of a total deprivation of mind will justify such a finding. We cannot so charge the jury. This is not the law, if the point is to be taken in the literal sense of the words in which it is conveyed. If this were the law, the wholesome operation of proceedings in cases of lunacy would be totally defeated. For there are perhaps but two classes of persons who can be said to be wholly deprived of their understanding. Idiots, or those whose mental fatuity comes with them into the world, form one class. An idiot has been described as a natural fool, or one who has laboured under fatuity from his

[M'Elroy's Case.]

birth, or one who knows not to tell twenty shillings, nor knows his own age, or who was his father.   Another class consists of those who have been in the possession of a sound mind, but are totally deprived of it by some accident, some dispensation of Providence.   You may trace instances of it in cases where the citadel of the mind is taken as it were by storm; where by some sudden calamity, reason is dethroned and madness usurps her place; where the unfortunate victim becomes a raving maniac— sees a deadly foe in every friend — knows not his father, his brother, his wife, or his child from a stranger, and turns against his own person as instruments to mutilate and destroy it, the hands that his Maker has given him for his benefit and protection; or when he becomes, after a life of sanity from his birth, seized with fatuity, and sinks into the listless condition of a natural fool. Such are the classes of persons who can be said to be wholly deprived of understanding.   Insanity can be easily traced in the idiot and in the raving maniac who is chained to the floor to save him from himself and to secure those around him from violence.

But we have no idea that insanity stops here; it may extend to persons who are perfectly rational upon several subjects, but labour under a permanent delusion as to one or more.   It may be found in a great variety of forms, from monomania or derangement on a single subject, to frantic madness, which involves a total loss of reason, and an entire alienation of the mental faculties. A person may converse with intelligence — he may display more than usual acuteness upon ordinary subjects, and yet in regard to others he may be in a complete state of delusion, and that delusion may be so fixed and permanent that no argument nor persuasion can disturb it.   Will it be contended that such a person is free from insanity?   Is it not evident that there is a disorder existing that not only implies insanity itself but is latently undermining the reason and spreading disorganization through the faculties of the mind?

A sound mind has been held to be one free from all delusion, when all the intellectual faculties exist in the usual and proper degree of harmony and vigour, and when the passions, affections and propensities are under the subordination of the judgment and the will.   An unsound mind is marked by delusion.   It takes the offspring of its own imagination for realities; it has not a proper perception of the natural connection or repugnancy of ideas. There are no delusions which more fully stamp the mind with the character of unsoundness, than those which are attended with an insensibility to or a perversion of the paramount feelings and dictates of our nature.   Delusion manifests itself in a callousness to a just sense of affection.   Strong traces of its inroads on the intellect are found, where a man hates without cause those who were formerly most dear to him; when he takes delight in acts of cruelty which are revolting to our nature; when he pertina-

[M'Elroy's Case.]

ciously adheres to some delusive idea, in opposition to the plainest evidence of its falsity; when a man conceives something extravagant to exist, which has in fact no foundation or existence, and adheres to it permanently in spite of all that can be done and said to reason him out of the conceit, then he is the victim of a permanent delusion, and whenever there is such a delusion, there is insanity or unsoundness of mind.

An insane delusion is exhibited in the belief of facts which no rational person would have believed. This delusion may exist in relation to a great variety of subjects, or it may be confined to one or two. When the delusion is thus limited, its existence is generally confirmed, and its insane character established by concurring circumstances; by irritability, violence, suspicion, and inconsistency in the mind and conduct of the possessor. It is held that the absence or presence of such permanent delusion on any subject or subjects forms in most cases the true and only test of insanity. Wherever it exists, there is insanity. In some cases the delusion grows in the first instance out of some slight circumstance, which it broods on and gradually magnifies. In other cases it takes its start in the adoption of some absurd prejudice which has no foundation. It has been decided that where there is a parent who has a child, and that child, who has really done wrong in some particulars, is fancied by him to be " a fiend and an incarnate devil," and he permanently acts upon that idea, he is in a state of morbid delusion and insanity. How much more so would he have been considered, had his child's conduct been perfectly irreproachable. When the mind labours under this sort of delusion in regard to particular subjects, it is called in the books partial insanity, as distinguished from total insanity, such as idiocy, or raving madness. But this is a distinction which should create no difficulty in the deliberations of the jury. For whether the insanity be total or partial, it is unsoundness of mind within the meaning of the statute. The distinction is more important in the application of the law of insanity to criminal cases. When a man is charged with a crime, and labours under total insanity, he is so clearly an irresponsible being, that the law does not consider him a fit subject for punishment, and he must be acquitted. Where he labours under an insane delusion in regard to a particular subject, (which is a case of partial insanity), the offence with which he is charged must have a connection with that subject, and must thus seem to have grown out of the delusion itself, or he will be convicted. It was considered unsafe to sanction a different principle in the administration of criminal justice. But in civil cases, where a person does an act or makes a contract, and labours under partial insanity at the time, it invalidates the act, though the act have no connection with the delusion which constitutes the partial insanity.

But the jury will not confine themselves to the inquiry whether

[M'Elroy's Case.]

unsoundness of mind exists; they will also inquire and determine whether it exists to such an extent as to disqualify the traverser from conducting himself with personal safety to himself or others, or from managing and disposing his own affairs; and by affairs is not meant merely his property, his estate, and business transactions. In the relation of father and husband, he is bound to protect and provide for his wife and children. The fact that a man may not as yet have squandered his property, is no security that he may not do it hereafter. The great object of the proceedings under a commission of lunacy, is to afford that security, and to protect those who look up to the traverser or his estate for protection and support. All the faculties of the mind may become disordered or alienated; they may not all be so at the same time or in the same degree. Some may remain in apparent full vigour, while the rest are diseased, or some may be affected in a greater and the rest in a less degree. It is hardly possible to express in words the nice distinctions that mark the boundaries of reason and insanity. However much may have been written on the subject as a matter of science, the common sense of mankind is the best guide in deciding the question of sanity or insanity when presented in a practical form; and it is justly asserted that *its decision can receive no great degree of aid from metaphysical speculations.*

1. A delusion upon particular subjects may be sufficient to authorize the jury to find the traverser of unsound mind. Whether the delusion be of such a character as to demand such a finding, is a question for the jury to determine. Where the delusion is a slight one and perfectly harmless, where there is no prospect or probability of it working harm or injury either to the traverser or his friends, in person or estate; a jury would not be likely to subject him to such a finding. Take the case of one whose personal vanity has grown into a delusion. He imagines his person the embodiment of beauty and symmetry. He spends hours in graceful attitudes before his glass. When he walks the streets he imagines everybody, and particularly the ladies, look upon him with admiration. The jury could scarcely perceive the necessity of interposing the law, or curtailing his innocent enjoyments by putting him in charge of a committee. But the case is very different where a man labours under a variety of delusions; where, without the least foundation for such a conceit, he fancies at one time a conspiracy to exist against his life amongst the hands and superintendents of the establishment where he is working; at another a conspiracy against him in the religious congregation of which he is a member; at another that all his own witnesses at the inquisition were whore-masters; at another that his family physician, a man of the highest character and reputation, has administered to him poisonous pills made of the womb of a dead woman; at another that money belonging to him

[M'Elroy's Case.]

remains concealed and buried in the earth; at another that his wife, a virtuous and good woman, is guilty of habitual prostitution and of incest with his own son. Delusions like these would justify a jury in pronouncing the patient of unsound mind, if they merely existed in the abstract and were not carried into practical operation. But when they are acted upon; when under these promptings he conceives a hatred for his long-tried and best friends; when he treats his neighbours with unnatural coldness and unfounded suspicion; when, as he passes from church, he thinks he hears his fellow-members whispering about him in words of detraction, pointing at him in scorn and derision, and saying that the very clothes on his back are unpaid for, while he is known to be a man perfectly independent in his circumstances; when he importunes a magistrate for a subpœna against a beautiful and accomplished young lady (to whom he probably never spoke in his life) in the expectation of compelling her to disclose the locality of the buried treasure; when he quarrels with his wife without cause or provocation, denouncing her for the interest she takes in the subject of the same religion which was once his own highest source of happiness; when he charges her, a lady of unexceptionable life and character, with adultery with numbers of the most moral and respectable citizens of the community; when he goes so far as to charge her to her face with a crime, the bare mention of which is painful to the feelings; when he not only makes such unfounded and shocking charges to her face, but spreads them abroad through the community, and attempts to found upon such alarming delusions a judicial proceeding against his own son and the mother that bore him; when his delusions break out in open violence, and he drives his wife, beaten and bleeding, from under the roof that should be her shelter, and at the same time raises his hand against his unoffending and worthy son; when he threatens to abandon his family, and expresses a desire to get hold of his estate in order to dispose of it, and thus raise the means of crossing the ocean; when he commits such outrages, and is guilty of such extravagant conduct, *under the influence of unfounded permanent delusion,* a more fit subject could not be found for a commission of lunacy.

The jury will then determine whether the traverser labours under unsoundness of mind, and whether such unsoundness is of such a character as to demand that the shield of the law should be thrown round himself, his family, his friends and his estate. If a man labour under a variety of delusions, when those delusions are entirely unfounded, when they are of a permanent character, when they lead to constant violations of the most sacred ties and duties on earth; when in their effects they come into daily and violent conflict with the rights and character of others, a jury would hesitate before they would pronounce such a man sane and capable of governing himself and managing his affairs.

2. The jury will determine, with the aid of the views which . have been expressed by the court, under what delusions the traverser labours, whether they amount to mental unsoundness, and if so, will determine from their character and effects whether he be a fit person to govern himself, with reference to the duties he owes to himself and others, and to manage his affairs.

4. In civil cases, it is not necessary that a person should be wholly deprived of understanding, in the literal meaning of the phrase, to make him incapable of making a binding contract. It is well settled that the existence of what is known in the law as partial insanity, invalidates the act of the party, (as we have already stated), even when that act has no connection with the particular delusion. It would take stronger evidence of insanity, however, to set aside, in a civil case, an act which has been attended with no injury to himself or his family, and where there has been no fraud or circumvention used, than it would to justify a jury in declaring him a lunatic.

5. We decline charging the jury in compliance with this point. It is for the jury first to determine whether he has been sane up to this time in his management and designs in regard to his property. Suppose he had been so, this in itself cannot exempt him from a charge of lunacy, if it be well established in other respects, nor is it any guaranty that he will continue so. A man may act with the utmost rationality and prudence for a time in regard to his estate, and yet be a proper subject for a commission of lunacy. As we have already stated, the jury are first to inquire, not whether the traverser is wholly deprived of intellect, not whether he has no mind at all, but whether his mind be sound or unsound. If they find him unsound in mind, then they will judge by the character of the unsoundness, its consequences and effects, whether it requires the traverser and his property to be placed in the guardianship of the law. But is the degree of prudence he manifests in regard to his property the only thing worthy of consideration in determining the question of his sanity? Has he no other duties to discharge than those which relate to the immediate care of his property? Have his wife and family no other interest than that which they have in the preservation of his property? Are they not entitled personally to his protection? and instead of protection shall they be visited with abuse and violence, with insult and injury? Have his neighbours no rights entitled to the protection of the law? Shall their character be subject to his detraction? Let the law once pronounce him sane and responsible for his words and actions, and his property may be swept away by damages in actions of slander. Shall the most moral and worthy members of society be implicated without the slightest foundation, day after day, in charges of the most destructive character? Shall such a man, thus unfortunately lost to every sense of duty towards himself, his family and his neighbours, be con-

[M'Elroy's Case.]

sidered capable of governing himself, or managing properly his affairs?

The counsel of the traverser excepted to the charge, and assigned for error the answers to the points submitted by them.

*Mahon* and *Lowry,* for plaintiff in error, cited 2 *Law Lib.* 6; 1 *Whart.* 52; 2 *Kent* 451; 2 *Johns. Ch.* 237; 4 *Cow.* 218; 12 *Petersdorf* 275, 390; *Cooper's Med. Jur.* 324; 1 *Phillips* 375; *Rey's Med. Jur.* 446; 4 *Rawle* 234; 12 *Petersdorf* 379.

*Black* and *Loomis,* contra, cited 1 *Whart.* 52; *Purd.* 722, sec. 67.

The opinion of the Court was delivered by

HUSTON, J.—There are cases in which deliberate opinions of great lawyers, or even the *dicta* of such men, seem to impose a restraint to investigation on certain subjects; and if these have been often cited as authority down to near our own time, the difficulty to be surmounted appears greater. Lord COKE, from his situation in life, had probably little intercourse with what occurs often to those who mingle much in society, and possibly, I may say probably, had never seen or never examined an idiot lunatic, or one *non compos mentis,* in his life; and though no doubt treatises on those subjects existed, we do not know what they were. We know much has been written on mental insanity; that the subject has employed the most eminent physicians, jurists and philosophers; that we have theories and the histories of those disorders of the mind by those who have had opportunities of observing the subjects of such disorders for many years; yet we find no treatise of the age in which Sir Edward COKE lived, quoted or even noticed.

On all subjects relating to rights of property, I admit his authority; but the subject before us is not the rights of idiots, lunatics, or of persons of unsound mind: it is his definition of what disordered state of the faculties constituted a person designated by those words; a matter more of medical than judicial cognizance. He says, " An idiot or fool natural, is one who from his nativity, by a perpetual infirmity, is *non compos mentis.*" Certainly it was not intended to leave this as a definition of idiocy. Another ancient and great authority, Fitzherbert, defines an idiot to be " one who from his birth cannot count or number twenty pence, or tell who his father or mother is, or how old he is;" " if he have sufficient understanding to know and understand his letters, or to read by teaching and information of another man, then he is not an idiot." Of this Lord TENTERDEN has said, " It is contrary to common sense; for as to knowing the letters of the alphabet, or reading what is set before him, a child of three years old may do that." 2. A person who was of good and sound memory, and by sickness, grief or other accident, wholly loses his

memory and understanding. 3. A lunatic, *lunaticus*, who some-
times has understanding and sometimes not, *qui gaudet lucidis
intervallis*, and therefore is called *non compos mentis* so long as he
has not understanding. The words " wholly lost his memory and
understanding," and the expression attributed to Lord HARDWICKE
in 3 *Atk.* 173, being *non compos mentis*, of unsound mind, are certain
terms in law, and import a *total deprivation of sense;* and these
expressions, adopted by Judge KENNEDY in delivering the opinion
of this court in quashing the inquisition in *Beaumont's case* (1
*Wharton* 55), were quoted and relied on by the counsel of the tra-
verser in this case. Although Atkyns is an elegant and generally
a correct reporter, yet it must be recollected that in his day the
Chancellor did not write his own opinions and give them to the
reporter, and that the expression may not have been used by the
Chancellor. But if it was used, it proves little. The words " of
unsound mind" had been used in the returns on inquests, and were
omitted in that case; and for this cause the inquisition was
quashed, and that weakness of understanding, as expressed, was
not equivalent, was decided. The words *non compos mentis*, or
unsound mind, were held necessary in point of form, and nothing.
more : for in the same book (page 184) we find an inquisition on the
same person, stated to have been found on the same evidence, but
in form stating Barnsley to be of unsound mind and incapable of
managing his estate, was affirmed. And more : the same Lord
HARDWICKE refused to allow it to be traversed, because two
inquests had found the same way; for, said he, although the first
was quashed for want of form, it was substantially the same
finding.

It has happened that the argument of counsel adopted by the
court, and carrying conviction in itself, is quoted as law. In the
defence of Hatfield, Mr. Erskine, speaking of the total deprivation
of memory and understanding, as put by Lord COKE, says : " If
this was intended to be taken in the literal sense of the words; if
it was meant that to protect a man from punishment he must be
in such a state of prostrated intellect as not to know his name,
nor his relation towards others; that if a husband, he should not
know he was married; if a father, that he should not know his
children; nor know the road to his own house nor his property in
it; then no such madness ever existed in the world. It is idiocy
alone, which places a man in such a helpless condition." He
afterwards admits that in delirium a person may not be able to
know any person or thing. " In all the cases which have filled
Westminster Hall with the most complicated considerations, the
lunatics and other insane persons who have been the subject of
them, have not only had memory in my sense of the expression—
they have not only had the most perfect knowledge and recollec-
tion of all the relations they stood in towards others, and of
the acts and circumstances of their lives, but have in general been

remarkable for subtlety and acuteness.   Defects in their reason-
ings have seldom been traceable.   The disease consisted in the
delusive sources of thought; all their deductions within the
scope of the malady being founded on the *immovable assumption*
of matters as realities, either without any foundation whatever, or
so distorted and disfigured by fancy as to be nearly the same
thing as their creation."   He then related a case tried in that very
house before one of the judges then present, of an indictment by
an insane person of his own brother and the keeper of an hospital,
for false imprisonment.   Mr. Erskine had not been informed as to
the nature of the insanity; and after the witness had detailed his
story, cross-examined him for more than an hour, and left no
means untried which his knowledge or his experience could sug-
gest; and when the jury and judge and audience were satisfied
that it was a most flagrant case of oppression and injustice, Dr.
Syms, who had attended the patient, came in and stated to the
counsel the nature of the malady, on which Erskine, with great
apparent humility, begged forgiveness for his rudeness, as he had
not known the witness.   Immediately the insane replied, with
great gravity, "I forgive you—I am the Christ;" and the trial
ended.

Most of the judges on this bench knew a member of the bar of
considerable legal acquirements, and those rather solid and sub-
stantial than showy or superficial.   For some considerable time
those near him saw a change, but it did not attract general atten-
tion ; he attended to his property and profession carefully and con-
stantly, and no want of skill or knowledge was discovered.   At
length his abuse in words of his wife and friends raised doubts as
to his sanity; his increasing violence and threats and attempts
removed all doubt, and his friends took him to the Pennsylvania
Hospital.   When there he became quiet and apparently composed.
He insisted on his sanity, had the managers and physicians called
together, and after many examinations and consultations was dis-
charged as of sound mind.   It was soon discovered that he was
still deranged.   He however took great care of his property.   At
length he charged one and another with robbing him.   His insan-
ity became dangerous, and strict confinement absolutely necessa-
ry, and he continued in that state, or growing worse, till he died.
So far from having lost all memory and power of understanding,
perhaps both memory and reasoning power were increased.   I
personally knew another person, a farmer, of good character and
understanding.   His insanity first showed itself by groundless
charges of attempts to kill him by his wife and children.   He
went armed, slept with arms near him and in his bed; then
threatened them and some neighbours.   He was taken also to the
same hospital.   At length he demanded his liberty; sent for a
most respectable gentleman in the city, who, having property near
where he lived, knew him, and had heard of his insanity and the

nature of it.  I do not know the particulars, but he acknowledged he had been wrong and violent, and after several examinations was discharged as of sound mind.  Yet, alas, it was a sad mistake; he continued deranged.  The objects of his delusion changed; his habits and manners and appearance changed; his conversation, especially on his profession of a farmer, was sensible and instructive, and he could relate distinctly his practice and the results for years.  He never showed much of the tiger, but much cunning.  He at length rambled often, or rather travelled on a good horse, from home; sometimes stayed a week at a place; always paid his bill; but would, when he became intimate with any person, show his concealed weapons and give obscure hints.  At length he sunk into fatuity and died.

All treatises on insanity and most reports of trials relating to insane persons, show that a total loss of reason and memory is unknown to courts and physicians, unless in cases of delirium from disease or absolute frenzy; and yet commissions of unsound mind are constantly found, and deeds and wills avoided for insanity.  Lord HALE, so far as I know, was the first judge who said and wrote, " There may be a partial insanity of mind, and a total insanity.  The former is either in respect to things *quoad hoc vel illud insanire,* to be mad as to this or that subject.  Some persons that have a competent use of reason in respect to some subjects, are yet under a particular dementia in respect to some particular discourses, subjects or applications."  Now we find that the nature and cause and cure of insanity have in a much greater degree engaged the attention of the benevolent and learned, both in the medical and juridical departments; and if the unbroken current of opinion of both physicians and courts, for more than half a century, has been, that a person is deranged, is *non compos mentis,* or of unsound mind, though not *totally* deprived of memory and understanding, but is only partially so deprived or on particular subjects, it would be strange if we should reject and disregard all the lights of science and experience, and all the current and weight of judicial decision in ecclesiastical, civil and criminal courts, from the time of Lord HALE to the present day, and all this from a reverence for COKE and FITZHERBERT, on a matter rather medical than legal or judicial.

To give a definition of insanity is admitted to have been found impracticable: and so also to give a description of the different kinds of insanity; because the several varieties pass into each other more imperceptibly and more frequently than insanity changes into healthy and sound mind.  But all writers and jurists agree, that an immovable delusion as to facts past or present is not merely a symptom of insanity, but is in fact insanity or the effect of an unsoundness of mind.  A man may have many absurd and unfounded opinions and belief as to matters and facts which never existed and do not now exist, but reason and demon-

stration and examination as to the present existence and state of visible and tangible substances, will correct these opinions and belief in a sane mind—but not so if the mind is deranged.  The false impression is proof equally against the strongest reasoning, the clearest proof, and against actual inspection.  The unhappy being will rather believe that his eye or his touch deceives him as to objects before him, than that his illusion is any thing but reality, and this while on every other subject you cannot discover any thing amiss in his faculties.

I knew a man of more than ordinary strength of mind, of information, of the strictest integrity, and so far as man could judge, devoutly and steadily and for many years religious.  In the wilderness, with a surveying party, he was attacked by an intermittent fever.  There was no physician and none of the comforts to be had in a well-furnished house with a wife and family.  His disorder changed to a regular ague, with distinct intermissions and chills and fever, and he set out very feeble for home on horseback.  There was for a long distance from him neither carriage nor carriage road, and the houses were cabins and not very near to each other.  On his way home, in more than one case, he had no house for twelve or more miles.  He reached home exhausted by a journey of several days.  The care of his family and attendance of an excellent physician soon removed his fever, but he was seized with the idea that his property was all gone, that he was involved in debt, &c. &c.  As soon as I heard of this I went to his house, and was constantly with him for some days.  He would converse as usual for hours, but a slight cause, or no cause discernible by me, brought on a recurrence of the dreadful illusion.  I knew his property in general, and I knew that he kept a regular account of his receipts and expenditures.  I had recourse to his books.  The accounts of every hireling, male and female, were settled to within a short period.  His bank book showed a large balance in his favour; and a sum advanced to a storekeeper a few months previous, was not taken up by his orders and the purchases of his family.  I took off the balances on a sheet of paper, and at the same time he did the same on another sheet.  Our additions and subtractions agreed, and showed a balance in bank, after paying every debt, of more than $1000.  While I was putting away the books he was walking about the room.  A friend came into the house, and to my astonishment and horror he told that person I had been endeavoring to impose on him by showing false books and a false abstract from them.  Now every letter and figure in those books was written by himself, and his abstract and mine agreed exactly.  Within a week, notwithstanding the utmost care and watchfulness of his friends, he was buried.  I have referred to this melancholy case as another instance of the unconquerable nature of the false perception or delusion under which the unhappy subjects labour; and for another reason; have not

[M'Elroy's Case.]

medical men and others relied too much, or looked too much, to injuries to the head? Did not this case commence with the want of the comforts and attention to which he had been accustomed, increased by his great debility? Though not directly in point of time connected with the delirium which often occurs during the fever or a severe fit of ague, yet may it not have been the consequence of it? May not the want of every thing he had been accustomed to, have started his peculiar insanity?

We have now so many treatises on insanity, its causes, its nature, the evidence of its existence, &c., by medical men, treatises in which the law on the subject has been collected and digested, that I shall not copy from what is in every good law library; and I. have no theory of my own to advance; nor shall I enter into the question whether, under our own Act of Assembly of 1836, the courts have power to interfere in cases of great imbecility of mind, though that delusion, which is either the cause or the effect, and certainly is the concomitant of most cases of insanity, does not exist. It is admitted by the counsel on both sides, that the statement of the facts testified to as proofs of insanity is correct and not exaggerated. I shall here insert that part of the charge *and the answers* to the points proposed by the counsel, and the concluding remarks of this learned and able charge, and merely say there was no error and that the judgment is affirmed.

Judgment affirmed.