## Young v. Dollar Savings Bank

*Frank F. Canuti* and *Anthony Cavalcante,* for plaintiff.

*Hill Burgwin,* for defendant.

*John M. Ralston* and *S. F. Clark,* for administrator.

FLEMING, P. J., forty-ninth judicial district, specially presiding, July 22, 1935.—This is an action in assumpsit, tried before the court without a jury, under the provisions of the Act of April 22, 1874, P. L. 109.

After service of the summons and the statement of claim upon it, the defendant, averring no interest in the deposit which is the subject of this controversy, petitioned the court for and obtained a rule upon the Freeport Bank and Trust Company, administrator of the estate of Letitia S. Young, deceased, the original depositor, to show cause why it should not interplead. This rule was made absolute upon the filing of an answer and an additional statement of claim on the part of the Freeport Bank and Trust Company, administrator as aforesaid. The issue, therefore, is a determination of the question as to whether the deposit is the property of William Young, the original plaintiff, or of the Freeport Bank and Trust Company, administrator of Letitia S. Young, deceased, the intervening plaintiff, as stated.

From the testimony taken we are of opinion that there have been established by a fair preponderance of the testimony, the following

*Findings of fact*

1. Letitia S. Young, a resident of Freeport, Armstrong County, Pennsylvania, was the widow of David Young, deceased, and at the time of her death on January 2, 1933, was approximately 78 years of age.

2. At the time of the marriage of the said Letitia S. Young to David Young, the said David Young was a widower with two sons, then of tender years, to wit, William Young, the plaintiff herein, and T. B. Young, for both of whom the said Letitia S. Young developed a strong attachment during her lifetime.

3. The said William Young, stepson as aforesaid, and plaintiff herein, is a resident of Uniontown, Fayette County, Pa.

4. The said T. B. Young, stepson as aforesaid, is a resident of Freeport, Armstrong County, Pa.

5. The Dollar Savings Bank of Pittsburgh is a duly incorporated bank of deposit, doing a general banking

business in the City of Pittsburgh, County of Allegheny and State of Pennsylvania.

6. The Freeport Bank and Trust Company is a duly incorporated bank of deposit, doing a general banking business in the Borough of Freeport, County of Armstrong and State of Pennsylvania, and also clothed with the right to act as a fiduciary and especially as administrator of the estates of intestates within the Commonwealth of Pennsylvania, and became, upon the death of the said Letitia S. Young, she dying intestate, the administrator of her estate, and duly qualified as such in the Orphans' Court of Armstrong County, Pennsylvania.

7. Letitia S. Young, in her lifetime, to wit, on October 30, 1915, opened in her own and individual name a savings account no. 364,269, in The Dollar Savings Bank of Pittsburgh, as aforesaid.

8. Letitia S. Young, in her lifetime, to wit, on September 5, 1931, executed an order in writing, signed by her and witnessed by S. A. Baltz, M.D., directed to The Dollar Savings Bank of Pittsburgh, ordering and directing the sum of $4,572.45, being the amount then standing to her individual credit in savings account no. 364,269, to be transferred to a new account, known as savings account no. 424,144 in the name and style of "Letitia S. Young in trust for William Young."

9. Letitia S. Young, averring that the pass book covering savings account no. 364,269 was lost, executed her bond agreeing to indemnify and save harmless The Dollar Savings Bank of Pittsburgh against any and all claims by any person under or upon said lost pass book and to surrender the same if and when found to the bank for cancellation, and requesting the issuance of a duplicate book on September 14, 1931.

10. The transfer of the sum of $4,572.45 standing in savings account no. 364,269 in the individual name of Letitia S. Young to savings account no. 424,144 in the name of Letitia S. Young in trust for William Young, pursuant to the order mentioned in finding no. 8 and the

bond mentioned in finding no. 9 was completed upon the books of the defendant bank on September 14, 1931.

11. At the time of the execution of the order mentioned in finding no. 8, the execution and delivery of the bond mentioned in finding no. 9, and the completion of the transfer of the said moneys mentioned in finding no. 10, the said Letitia S. Young was of sound and disposing mind, memory and understanding.

12. Letitia S. Young was not personally present at the bank either upon the delivery of the order mentioned in finding no. 8, the delivery of the bond mentioned in finding no. 9, or at the completion of the transfer mentioned in finding no. 10, but was represented thereat, in each instance, by William Young, plaintiff herein, acting, not in his own behalf, but as the agent for Letitia S. Young.

13. The pass book for savings account no. 424,144, being the account standing in the name of Letitia S. Young in trust for William Young, was not delivered to the said Letitia S. Young in person but was delivered to William Young as agent for the said Letitia S. Young and without express direction from her to make delivery in such manner.

14. The pass book mentioned in the preceding finding was never in the possession of Letitia S. Young at any time from the delivery thereof by the bank to William Young to the time of her death.

15. On October 31, 1931, the said Letitia S. Young was adjudicated at no. 161 December term, 1931, Court of Common Pleas of Armstrong County, Pennsylvania, after hearing, to be so mentally ill as to be incapable of managing her estate and likely to become the victim of designing persons, and T. B. Young, stepson mentioned in findings nos. 2 and 4, was appointed her guardian and directed to give bond in the sum of $4,000, which bond was not approved and filed until January 27, 1932.

16. On March 10, 1932, T. B. Young, guardian as aforesaid, forwarded a copy of the order of the court

directing his appointment to The Dollar Savings Bank of Pittsburgh and wrote it as follows: "You will find that the said Letitia S. Young was known to be incompetent for the transaction of business for more than one year preceding the creation of the alleged trusteeship of this account and you are accordingly notified to not pay out or transfer said account to any person except the legal representatives."

17. The estate of Letitia S. Young, deceased, has not been closed and while there is not at present sufficient personalty to pay all existing indebtedness, there is a collectible sum due from the estate of David Young, deceased, which, when collected, will enable all indebtedness to be paid in full, regardless of the account in controversy.

18. There is no evidence of the exercise of undue influence by the plaintiff, William Young, or anyone in his behalf, upon Letitia S. Young regarding the transfer of account in question.

### Discussion

1. Was Letitia S. Young of sound and disposing mind, memory and understanding when the transfer was made?

It is plain that, were this question to be answered in the negative, further discussion would be unnecessary and judgment should be entered for the administrator. However, having answered this question in the affirmative, it is proper that we should state our reasons for such a finding.

The established rule is that every person is presumed to be sane and to have the mental capacity to contract until he or she has been declared otherwise by a court of competent jurisdiction. In the instant case, in addition to this presumption the only direct testimony is the testimony of a reputable physician of Fayette County, who saw Mrs. Young on the days when she signed the order of transfer and when she signed the bond relating to the

lost pass book. He stated clearly and positively that, as far as he could see, she was perfectly normal. Her general conversation was reasonable and from her specific references she appeared to know what she had and what disposition she wanted to make of her possessions. We have carefully considered the testimony of Dr. Henninger, called on behalf of the administrator, and who was admitted to be an expert on mental diseases, of long experience and of high standing, but it must be borne in mind that Dr. Henninger did not see Mrs. Young until six months after the transfer in question had taken place and that the senile dementia with which she was then suffering sometimes develops very rapidly. All of the witnesses, including Dr. McLaughlin, who was Mrs. Young's family physician, testified that in this disease the patient's condition varies greatly from day to day, from week to week, and from month to month. It is, therefore, entirely possible, even though the symptoms had been exhibited for a considerable period prior to September 14, 1931, that on that date she was in a frame of mind capable of understanding what she was doing. The nature of her act was wholly rational, and from the close relationship which had existed between her and her stepsons it cannot be said that her expressed desire to do something for the plaintiff, William Young, was anything more than the exercise of a normal inclination. It has been repeatedly and properly ruled that the showing of a preference is no proof of mental incapacity. Furthermore, there is not the slightest bit of evidence to show that influence of any sort was brought to bear upon Mrs. Young by William Young or by anyone on his behalf. In Herzog on Medical Jurisprudence, 518, sec. 700, it is said: "Infirmity due to old age does not in itself show lack of testamentary capacity; and even though a person is suffering from senile dementia, his mental powers still may be sufficient to enable him to make a valid will." In Lidstone's Estate, 92 Pa. Superior Ct. 553, it was held that lack of testamentary capacity is not

proven by a lapse of memory or inaccurate statements on the part of a woman 78 years of age.

We are, therefore, quite fully convinced that our affirmative answer to this question is fully supported by the weight of the testimony.

2. Does the fact that the pass book was delivered to William Young, the beneficiary, and remained in his possession until the trustee's death constitute this an irrevocable trust or an executed gift?

The naked possession of the pass book, although sometimes evidence of intention, no longer definitely rules the question as to whether such a transaction is a gift inter vivos or not. In Scanlon's Estate, 313 Pa. 424, it is said at page 427: "An essential element of a gift inter vivos is that the donee be given complete control of the subject-matter and the donor release his dominion". Letitia S. Young was an aged person. At the time of the transfer she was living in Uniontown, Pa., with her stepson, William Young, in whom she had the greatest confidence. Under all the circumstances we are fully and reasonably entitled to conclude that William Young acted merely as her agent in effecting the transfer of the account in question, and that the delivery of the pass book to him by the bank, and his continued possession thereof until Mrs. Young's death, does not show an intent upon her part to make the transaction an irrevocable trust or to constitute a gift inter vivos. While it is true that the pass book was in William Young's possession at all times, yet the very nature of the transfer negatives any idea of the vesting of absolute title in him. Had such been Mrs. Young's intent her simplest method of doing so would have been to transfer the account directly to the name of William Young. This is especially so when it is considered that William Young was of full age and fully competent to receive a direct transfer. It is plain that Mrs. Young used this form of account to the same end that such accounts are commonly and increasingly used, to wit, the placing of her moneys in a position where they

might be used by her, during her lifetime, if needed, the remainder to become the property of William Young when she, while living, might so direct, or at her death provided such had not been previously revoked by her while living or by her last will and testament at her death. The possession of the pass book by William Young is, therefore, in no way definitive of an intent by Mrs. Young to make the same an irrevocable trust or to constitute the same a gift inter vivos. The right of possession was always in Mrs. Young and no unequivocal surrender of such right appears to have been made.

3. Has absolute ownership in the account in question vested in William Young, the beneficiary, the trustee not having revoked the same during her life or disposed of the same otherwise by will?

We appreciate the fact that the above question as stated does not fully exhibit the exact factual situation in the instant case. We have stated it in such manner in order that we may point out the law as it appears to exist today in cases not clothed with the unique facts to be hereinafter considered.

Unquestionably, had not the fact of an adjudication of incompetency, with the consequent appointment of a guardian for Mrs. Young and the notice by the guardian to the defendant bank appeared in this case the same would have been squarely ruled by Scanlon's Estate, supra, and the fund awarded, pursuant thereto, to William Young. The rule therein laid down, following In re Totten, Admr., 179 N. Y. 112, 125, 71 N. E. 748, is stated as follows:

"A deposit by one person of his own money, in his own name as trustee for another, standing alone, does not establish an irrevocable trust during the lifetime of the depositor. It is a tentative trust merely, revocable at will, until the depositor dies or completes the gift in his lifetime by some unequivocal act or declaration, such as delivery of the pass book or notice to the beneficiary. In case the depositor dies before the beneficiary without rev-

ocation, or some decisive act or declaration of disaffirm-
ance, the presumption arises that an absolute trust was
created as to the balance on hand at the death of the de-
positor."

Mrs. Young made no testamentary disposition of the
fund contrary to the trust, as was the case in Scanlon's
Estate, supra, nor does there appear to have been any de-
cisive act or declaration of disaffirmance on her part at
any time. This brings us, therefore, to the determining
question in this case.

4. When one person, being of sound and disposing
mind, memory and understanding, makes a deposit of his
own money, in his own name as trustee for another, and,
having done nothing to complete the gift or having per-
formed no decisive act or made any declaration of dis-
affirmance, subsequently is adjudicated by a court of
competent jurisdiction as an incompetent, and a guard-
ian is appointed for him, which guardian seeks to dis-
affirm the trust prior to the death of the depositor, who
does not regain her competency, is such disaffirmance by
the guardian sufficient to revoke the trust and defeat the
right of the beneficiary to hold the deposit absolutely?

In other words, we are to determine to what extent, if
any, guardians are clothed with discretion to review and
adjust or repudiate the acts of their wards which have
been done prior to the adjudication. A brief historical
consideration of the subject of mental illness may assist
us in deciding this question.

The common-law right and duty of the king to receive
the property of a subject becoming non compos mentis,
and to look after his person and estate, together with the
statutes enacted in relation thereto, were supplanted in
Pennsylvania by the Act of June 13, 1836, P. L. 589. This
act directed the issuance of a commission, in the nature
of a writ de lunatico inquirendo, to inquire into the
lunacy or habitual drunkenness of any person within the
State or who possessed real or personal property therein.
The term "lunatic" was defined to include every person

of unsound mind, whether he may have been such from his nativity, as idiots, or has become such from any cause whatsoever. Upon an adjudication as such a committee is named by the court for such person. This committee is authorized to look after the management of the real and personal estate of the lunatic and also to, from time to time, apply so much of the income thereof as shall be necessary for the payment of the just debts and engagements and for the support and maintenance of such person and his family and for the education of his minor children. There is no express power of discretion to review the ward's acts before adjudication conferred by this act.

Such legislation, involving as it does the liberty of the individual as to his person and property, quite naturally brought about much uncertainty as to the exact line marking lunacy, as provided in the act, on one side, and mere weakness of mind on the other. Beginning with M'Elroy's Case, 6 W. & S. 451, and continuing until the enactment of the Act of June 25, 1895, P. L. 300, there was difficulty in determining whether such person was a "lunatic" in the meaning of the Act of 1836, or whether such person was merely "eccentric" or "weak-minded", or something else but less than a "lunatic". At that time there was no provision concerning those in this last-named class and to provide therefor the Act of 1895, supra, was enacted. This act provided that proper procedure should be had for the protection of "any person, being a citizen of this State, [who] shall become or be so weak in mind, that he or she is utterly unable to take care of his or her property and is therefore liable to dissipate or lose the same and to become the victim of designing persons". This is better stated in the words of Chief Justice Mitchell in Hoffman's Estate, 209 Pa. 357, wherein he says that the Act of 1895 extended the protection of the State to the property of a class of persons whose mental condition is "intermediate between normal mental capacity and insanity or idiocy, a state of weak

or enfeebled mind, neither mens sana nor non compos mentis."

Section 6 of the Act of 1895, supra, bestows upon guardians the same powers and duties "as the guardian of the property of minors in the State of Pennsylvania". This throws very little light upon the subject because it is well recognized that only in rarely excepted cases could a minor's act before the appointment of a guardian be a valid or a binding one. However, the Act of May 28, 1907, P. L. 292, the act under which Mrs. Young was adjudicated by the Court of Common Pleas of Armstrong County, and which is, in effect, a reënactment of the Act of 1836, supra, and its supplements, restates the powers and duties of guardians as being the same "as a committee on lunacy in the State of Pennsylvania". We have noted above the lack of discretionary power concerning acts done prior to adjudication in committees in lunacy under the Act of 1836.

Committees in lunacy, as we have noted, are empowered to manage the real and personal estate of the lunatic. There can be no other reasonable interpretation but that the subject of the management of such committees is the estate which comes into their hands at the time of their appointment. There were no children to educate in this case and there being testimony that there is an ample and collectible sum due from the estate of David Young, deceased, the sum in question here was not necessary for any of the purposes of the guardian as outlined by the statutes. In Gorgas v. Saxman, 216 Pa. 237, at page 239, Mr. Justice Elkin says:

"It will be observed, however, that a proceeding under the provisions of that act [referring to the Act of 1895, supra] is different in scope and character from one de lunatico inquirendo. It is an act intended for the protection of persons unable to care for their own property, and is not so far reaching as a proceeding in lunacy. The power to find how long the person hath been weak-

minded, and to make decrees regarding the disposition of property made prior thereto, is not conferred by the statute. It is apparent that the act was intended to operate prospectively, in order to protect a person, not a lunatic, nor an habitual drunkard, but weak-minded, against his own improvidence thereafter."

We have considered the general nature and character of the savings account in question as pointed out by the defendant bank. We recognize it to be, as we have said, one of those accounts, ever increasing in number, where the depositor places his money in a way in which he can use it if he needs it or wants it, but where it, or the unused balance thereof, will pass to a designated person at his death without the expense and inconvenience of administration. It is a creature of the mind of the depositor and the exhibition of his will. As such it passes with other estate to the guardian for the purposes, and only for the purposes, which the statute has enumerated. In the total absence of a power of discretion bestowed by statute the only right concerning the same which is acquired by the guardian is to preserve the account in statu quo, protecting it against any and all emergencies which might tend to deplete or destroy it, and using it, or any part of it, only by the approval of the court, when it becomes necessary to do so to provide for the support and maintenance of the ward or his family or to educate his minor children. None of these exigencies was present in the instant case. There is nothing in the statute, either expressly stated or which may be gathered by implication, to enable the guardian to substitute his naked will for the will of the ward expressed clearly while the ward was yet competent to act for himself or herself. In the words of Gorgas v. Saxman, supra, there is no power conferred upon the guardian to find how long Mrs. Young was weak-minded and no power given to the court to make decrees regarding her disposition of her property prior to her adjudication as an incompetent. We cannot agree with the learned counsel for the defendant

bank that to hold other than that the guardian took the place of the incompetent and succeeded to all of her rights, including the right to revoke the trust and to withdraw the money, would effectually frustrate the clearly expressed will of the depositor. On the contrary we are of opinion that to so hold would utterly destroy that which she, while sane and competent, sought to establish. Our thought in this connection is emphasized by the existing fact that the estate is solvent and that all bills can be paid without recourse to this fund. Chief Justice Mitchell in Hoffman's Estate, supra, speaking of the Act of 1895, reënacted by the Act of 1907, says:

". . . a dangerous statute easily capable of abuse by designing relatives to accomplish the very wrong intended to be guarded against, and therefore to be administered by the courts with the utmost caution and conservatism."

In answer to the contention of the learned counsel for the bank as to what would become of the money under a holding that the guardian of an incompetent was without power to revoke a trust of this nature, we would say that such moneys remain in statu quo, as we have said, the guardian charged with the duty of protecting it against the insolvency of the bank or other dangers which might deplete or destroy the same, all the while permitting the fund to earn the increment intended by the depositor and the bank. The guardian becomes a substituted trustee, the substitution being ex officio, but carrying no power to revoke the trust or to consume the principal or income thereof, or any part of the same, except, in the latter instance, when the approval of the court is obtained after showing the same to be necessary to enable the guardian to carry out any of the powers expressly given him by statute and then only to the exact extent of such necessity. Upon the death of the ward the sum remaining becomes the absolute property of the beneficiary. We cannot see that such can cause confusion

in banking circles in any way. This is but to effectuate the true intent of the depositor as expressed while competent to do so.

We, therefore, have reached the following

### Conclusions of law

1. The attempt of the guardian to revoke the trust imposed by Letitia S. Young as shown by savings account no. 424,144, by letter dated March 10, 1932, was ultra vires and void and of no effect.

2. The said trust so imposed by Letitia S. Young was not legally revoked or disaffirmed in any manner prior to the death of the trustee, Letitia S. Young.

3. Under the rule in Scanlon's Estate, 313 Pa. 424, the fund is now the property of William Young, original plaintiff herein.

4. Judgment should be entered in favor of William Young and against The Dollar Savings Bank of Pittsburgh, Pa.

5. The amount of such judgment should be liquidated by the prothonotary at the final determination of these proceedings, upon certificate filed by The Dollar Savings Bank of Pittsburgh, showing the exact amount due upon account no. 424,144 on the date of such final determination.

Whereupon, we enter the following

### Decree nisi

And now, July 22, 1935, judgment is directed to be entered in favor of the plaintiff, William Young, and against the defendant, The Dollar Savings Bank of Pittsburgh, Pa., in such sum as shall be shown to be due upon savings account no. 424,144, in the name of Letitia S. Young, in trust for William Young, at the final determination of these proceedings, by a certificate to be filed by the said The Dollar Savings Bank of Pittsburgh, Pa., with the prothonotary. And in conformity with the provisions of section 2 of the Act of April 22, 1874, P. L. 109,

the prothonotary is directed to forthwith give notice to the parties or their attorneys of the filing of this opinion and decree nisi and unless exceptions thereto are filed within 30 days after the service of such notice, judgment shall be finally entered as above decreed. If exceptions are filed within 30 days the prothonotary is directed to put the matter upon the argument list sec. reg. et sec. leg.