# Hinchman *v.* Richie.

[April 9, 1849.]

Conspiracy consists in an *agreement* or common design to do an unlawful act; or to do a lawful act, for an unlawful end, though nothing be done in pursuance of it: it is then indictable; but is not the subject of a civil action, unless some act be done to give effect to the purposes of the conspirators, either of extortion or mischief.

When the fact of the combination of the individuals in the unlawful enterprise is shown, every act and declaration of each member of the confederacy, in pursuance of the original plan, and with reference to the common object, is, in contemplation of law, the act and declaration of them all, and is original evidence against them.

It makes no difference at what time any one came into the conspiracy: every one who does enter into such a common design is, in law, a party to every act which had been previously done by any of the others in pursuance of it.

It is not a violation of the bill of rights to restrain an insane person of his liberty, without oath or affirmation.

In an action to recover damages for restraining one of his liberty, as a lunatic; the question for the jury is, whether the safety of the person himself, or that of his family, or friends, or neighbours, required that he should be restrained for a time, and whether such restraint is necessary for his restoration, or will be conducive thereto.

An action of *conspiracy*, for confining the plaintiff in a lunatic asylum, cannot be sustained if the defendants conscientiously believed that the plaintiff was deranged, and required for his recovery medical treatment under restraint.

Although the existence of a conspiracy to confine the plaintiff in a lunatic asylum be proved, yet neither the signing of a certificate of lunacy by a physician, nor the receiving and keeping of the plaintiff in the asylum, by the officers thereof, nor the serving as a juror on an inquest by which the plaintiff was found a lunatic, but which was afterwards set aside, will render either the physician, the officers of the asylum, or the members of the inquest, co-conspirators, unless they had knowledge of the existence of the conspiracy, and their several acts were corruptly done in furtherance thereof.

The suing out of a commission of lunacy is not actionable, unless it be done maliciously and without probable cause.

The finding of an inquisition of lunacy, in the absence of improper motives, is proof of probable cause.

[Hinchman v. Richie.]

The finding of an inquisition of lunacy may be impeached on the ground of fraud, and in such case, it will furnish no justification for the arrest and confinement of the party.

On granting a commission of lunacy, it is the duty of the court to make an order directing notice to be given to the party, or his near relations, who are not concerned in the application; and in the absence of any such order, an omission to give notice is not to be imputed as a fault to the persons suing out the commission.

Such relations or friends as counsel a finding against the alleged lunatic, are excluded from the list of persons competent to receive notice of the execution of the commission.—KRAUSE, P. J.

A second commission cannot be issued upon the original petition, where the inquisition and proceedings under the first commission are set aside. —KRAUSE, P. J.

THIS was an action on the case, in the nature of a writ of conspiracy, brought by Morgan Hinchman against Samuel S. Richie, Edward Richie, John M. Whitall, George M. Elkinton, John Lippincott, John D. Griscom, Anna W. Hinchman, John L. Kite, Elizabeth R. Shoemaker, Benjamin H. Warder, Philip Garrett, Joshua H. Worthington, Charles Evans, William Biddle and Thomas Wistar, Jr.

The first count in the declaration charged that the defendants conspired together to aggrieve and impoverish the plaintiff, *and get possession of his property*, and to cause him to be suspected and·believed to be a person of unsound mind, and incapable of managing his business and governing himself, and to cause him to be arrested away from his home and confined in a lunatic asylum; that in pursuance of such conspiracy, one of the defendants, the said Kite, signed a false certificate, purporting that the plaintiff was insane; that when the plaintiff had come as usual to the city of Philadelphia, to bring the produce of his farm to market, and had disposed of the same, and was about to return to his home, another of the defendants, Samuel S. Richie, got a certain Jesse White to make an appointment with the plaintiff, to wait for him the next morning at the hotel where the plaintiff staid, under pretence of purchasing one of the plaintiff's houses; that on the following morning

[Hinchman v. Richie.]

John M. Whitall, George M. Elkinton, Edward Richie, John Lippincott, John D. Griscom and Samuel S. Richie, assembled at the hotel, and when the plaintiff came in from ordering his horses and wagon to be harnessed, two of the defendants, John M. Whitall and George M. Elkinton, falsely pretended that they wanted some private conversation with the plaintiff, and under such false pretence accompanied the plaintiff to his chamber; that Lippincott, Griscom and Edward Richie came into the chamber immediately afterwards, and told plaintiff they were going to take him to a lunatic asylum; that they compelled the plaintiff to go with them to the door of the hotel, where Samuel S. Richie had, in the mean time, brought out plaintiff's horse and wagon, into which they forced him, and carried him off to a lunatic asylum; that Garrett and Worthington received him at the asylum, and together with the said Warder, Kite, Evans, Shoemaker, Biddle, Anna W. Hinchman and Wistar, detained him therein for the space of six months. That afterwards Samuel S. Richie, Edward Richie, and Elizabeth R. Shoemaker, in pursuance of the conspiracy, took plaintiff's horses and wagon, went up to his dwelling and farm in Bucks county, took possession of his books and papers, examined them and took them away, and took possession of his farm, and carried off his stock, farming utensils, grain, crops, and furniture, and in conjunction with Wistar, converted much of it to their use. That Anna W. Hinchman, Biddle, Griscom, Elkinton, Shoemaker, and Samuel S. Richie, persuaded and procured Eliza W. Hinchman, plaintiff's mother, to sign a petition to the court of common pleas of Bucks county, to have a commission of lunacy issued, to be executed in the county of Philadelphia. That the defendants afterwards, in pursuance of the said conspiracy, falsely, maliciously and without probable cause, procured a commission of lunacy, on the petition of the said Eliza W. Hinchman, to be issued out of the court of common pleas of Bucks county, directed

[Hinchman *v.* Richie.]

to one John D. Michener, and proceeded to execute the same, at the asylum, where the plaintiff was confined, without allowing him the advice or presence of counsel, or of any of his friends; and did falsely, illegally, and corruptly, procure the said inquest to find him a lunatic, and that he had been so for eighteen months then last past, without lucid intervals; which inquisition the defendants, in pursuance of their conspiracy, corruptly withheld, and made no return thereof, until after they had sold and disposed of all his personal property. That afterwards the said inquisition and all the proceedings in the case were set aside by the court of common pleas of Bucks county, and the plaintiff was duly discharged of the premises. By means whereof he had been greatly injured in his credit and reputation, and had suffered great anxiety and pain of body and mind, and had been forced to expend large sums of money in defending himself and manifesting his sanity; and also plaintiff's property to the amount of five thousand dollars had been lost and destroyed, carried away and sacrificed, and he himself had been prevented from following and transacting his lawful and necessary business for the space of eighteen months.

The second count charged that the defendants conspired for the like purposes, and to secrete the plaintiff in said asylum, for the purpose of confining him from his friends, &c., and in pursuance of such conspiracy, caused and procured him to be confined and imprisoned, without any reasonable or justifiable cause whatever, and against his will, in the said asylum, for the space of six months, and took possession of his property, and converted and disposed of the same to their own use. And that they might have a reasonable pretence for keeping him in said asylum, they falsely and maliciously persuaded his mother to sign a petition to the court of common pleas of Bucks county, for a commission of lunacy against him, &c.

The third count charged a like conspiracy, and *to compel*

[Hinchman *v.* Richie.]

*him to settle his property on his wife and children;* and that in pursuance of such conspiracy, the defendants falsely and maliciously represented to his mother, that he was incapable of managing his business, and was squandering his estate, and ill treating his wife, and had better be taken to the asylum, &c. Also charged his arrest and imprisonment in the asylum, in pursuance of such conspiracy, without any legal or justifiable cause, &c.

The fourth count charged, that the plaintiff having been seized, when away from his home, by some of the defendants, and forcibly and against his will, taken to and confined in the asylum, the defendants conspired to keep him in confinement, *until he would consent to give up the management of his property, and settle the same on his wife and children,* and did forcibly and against his will keep him confined for the space of six months, &c.

The parties in this case were all members of the society of Friends. Most of the defendants were relatives either of the plaintiff or of his wife; to whom he was married in 1839, and with whom he resided in Philadelphia until the spring of 1844, when he removed to a farm in Bucks county, which he had lately purchased. During his residence in Philadelphia, the plaintiff was employed as a clerk in the bank of Penn Township. He lived on his farm until about the 7th of January, 1847, when he was taken to the Friends' lunatic asylum, near Frankford.

It was shown on the part of the plaintiff that his relatives, having come to the determination to confine him in a lunatic asylum, procured from Dr. John L. Kite, a physician, who had not seen him for four months, a certificate of his insanity. On the 5th of January, 1847, plaintiff geared up his horses and wagon and started for the city of Philadelphia, with a load of marketing, as he was in the habit of doing, regularly, once in every two weeks. When he left home, nothing unusual was observed in his behaviour; he gave directions to the persons in his employment, before

starting, as to their occupation, told them to take care of the cattle, and promised to return as soon as possible. He left behind him his wife and three children, one of whom died before he again met his family. Having disposed of his marketing, and made preparations for his return on the following morning, the plaintiff was visited by Jesse White, at his hotel in the city of Philadelphia, who spoke to him about a house which Hinchman had previously tried to dispose of, and left him after ascertaining that he would be at the hotel at eight o'clock the next day.

Jesse White called on plaintiff, on this occasion, at the request of Samuel S. Richie and George Dilks, (Richie's brother-in-law.) They said Hinchman was crazy, they wanted to take him to the asylum, and wished White to make an appointment with him in order to detain him in the city until the following day. White observed nothing like insanity about the plaintiff, but having made the appointment with him, went out and informed Edward Richie of it, the others having previously left.

On the following day, Samuel S. Richie, Edward Richie, John M. Whitall, George M. Elkinton, Dr. John D. Griscom, and John Lippincott, went to the tavern, and met the plaintiff. They told him they wanted to speak with him; they wanted him to go with them. Hinchman answered, that he had not time, but would take them into a private room and talk with them there. They went up stairs together, after which one of them came down, and told the bar-keeper not to be alarmed if there was a scuffle, as they considered him a lunatic, who was wasting his property and spending his money. At the interview with the plaintiff they told him that now he must abandon his business and go to the asylum; he was unwilling to go, and resisted, but they said, *it was no use to resist, they were prepared to take him by force.* They then took him down stairs, one having hold of each arm; in passing through the bar-room, he caught hold of the counter, and called for the landlord:

they dragged him from the bar, and notwithstanding his struggles forced him to the door, where his own wagon and horses had been brought round, by order of one of the Richies. They placed him in the wagon, from which he attempted to escape, but was forcibly held back by the defendants; when Samuel S. Richie took the reins and drove to the asylum, where the plaintiff was received, on presenting Dr. Kite's certificate and Mr. Warder's order for his admission, by Mr. Garrett, the superintendent.

At the asylum Hinchman was placed in a room with several insane persons, one of whom was extremely offensive in his person and behaviour, and another of whom made a violent attack upon him on the day succeeding his arrival, and inflicted on him a severe blow. He was denied all intercourse with his friends, and, in accordance with the rules of the institution, his letters were not permitted to be placed in the post-office. The plaintiff was here considered by the keepers to be a sane man. While in the asylum, *he was urged to execute a deed of trust of his property for his wife and children,* which he constantly refused to do.

After depositing Hinchman in the asylum, the wagon and horses were brought back to his farm by Samuel S. Richie, accompanied by plaintiff's wife and Elizabeth R. Shoemaker, one of the defendants, his sister-in-law; who took possession of the farm, as also of his books and papers, and commenced selling off his stock. One Jacob Heston, a judgment creditor of the plaintiff, thereupon issued execution, and levied on his personal property: this execution, on the 14th of January, 1847, was marked to the use of Edward Richie, one of the defendants, and a writ of *venditioni exponas* was subsequently issued, under which all the personal property was sold, much of it at a very great sacrifice. The sale was conducted by the Richies, who appear to have had control of the process, the sheriff not being present at a portion of the sale, which

occupied several days. Many of the goods were taken from the farm to the house of Elizabeth R. Shoemaker, at Germantown, after the sale.

On the 9th of January, 1847, Eliza W. Hinchman, the plaintiff's mother, made affidavit to a petition to the court of common pleas of Bucks county, for a precept in the nature of a writ *de lunatico inquirendo*, to inquire whether Morgan Hinchman was a lunatic, and such other matters as are required, by law, to be inquired into in such cases. On the 1st of February, 1847, John D. Michener was appointed commissioner for that purpose, and on the 4th of February, the writ was issued. The inquest (who were alleged to have been fraudulently selected from a list made out at Mrs. Hinchman's house) met at the asylum on the day following and were there qualified: witnesses were then examined, the two Richies among others, in the absence of the plaintiff; afterwards he was brought in, and began to converse with Eli K. Price, who was his mother's counsel; Hinchman inquired what was going on, and when he discovered their business, said he should like to have some of his friends there. Mr. Price asked, if he did not consider him a friend, to which Hinchman replied, he would rather have his friends there and his own counsel. He was not permitted to send for friends or counsel. A member of the inquest testified that he saw nothing in Hinchman's manner or appearance to warrant the belief that he was insane.

The inquest found that Morgan Hinchman was a lunatic, and had been so for eighteen months last past, *without lucid intervals*. On the 27th of April, 1847, the inquisition was returned, and confirmed *nisi*, and Lloyd Mifflin appointed committee of his person and estate, on giving security in $4000, which was duly entered.

In April, 1847, the fact that Morgan Hinchman was confined in a lunatic asylum, became accidentally known to his uncle, Benjamin M. Hinchman, his father's brother,

[Hinchman v. Richie.]

and Samuel B. Fisher, the husband of his father's sister, who immediately took measures to effect his release. Mr. B. M. Hinchman first called on Dr. Griscom, who said, he had not given the certificate of his insanity, but would have given such a certificate at any time within the last three years, if called upon to do so. He said, he understood Morgan was *wasting his estate, by wild and foolish speculations,* that he ill-treated his wife, and the night on which he left for the last time, he was so violent, that her life and that of the children were in danger. The doctor had heard this from his mother and other members of the family—he was his mother's physician. Mr. B. M. Hinchman replied, he supposed the doctor was aware that *there had been some differences between mother and son, and she had become exasperated against him;* that he must have known something of his mother's peculiar temperament; and that in all matters where her interest and feelings were concerned, her statements should be received with due allowance. The doctor said, he was present at Morgan's arrest, and narrated the facts attending it to his uncle. Mr. Hinchman next visited the asylum, in company with his sister, Mrs. Fisher, and had an interview with their nephew, which satisfied them of his sanity. In the course of two weeks the uncle again visited the asylum in company with his cousin, Howard Hinchman, and conversed with Mr. Garrett, the superintendent, in relation to his case. Garrett said, there was not much the matter with him, he might soon be discharged. Morgan then applied for liberty of the grounds, and to dine and eat in the parlour, and said, if there was any difference in the price of board he would pay it; *but it should be understood, this was not to waive his claim for damages.*

Edward Richie subsequently called on B. M. Hinchman, and spoke of Morgan's case; he said, he thought him insane, and that his friends did also, and advised that he should be placed in the asylum: he named his mother, his sister, his

sister-in-law, and others.   He further said, that *it had been proposed, that if Morgan would allow his property to remain in trust for the benefit of his family and self, he might come out as soon as he pleased;* there would be no objection to his coming out then.   Mr. Hinchman replied, that if Morgan was insane, it was not proper to let him out; and *if he was sane, not proper to deprive him of his property.*   Richie then said, *the fact of Morgan's being in the asylum would interfere with the management of his affairs; he might have difficulty; and in case he left his property in trust, his friends would assist him in paying off incumbrances.*   In June, 1847, Margaretta Hinchman (Morgan's wife) met his uncle at Edward Richie's house, and it was again proposed, that *if the property was put in trust, there would be no objection to his coming out of the asylum.*   Mr. Hinchman replied, he could not see the propriety of either keeping his nephew in the asylum, or putting his property in trust, when, from all accounts, he was managing his property well: his wife said, he had been wasting his property, and she did not think him fit to manage it; and, as an instance, she said, he sold a pair of chickens to a coloured man, on credit, that he didn't know. She added, that he had never been guilty of any violence; he had never raised his hand against her, and she had never said so: she said, he could leave the asylum, *if he would put his property in trust,* come to Germantown and board with her sister, but he must be subject to the rules of the house; he must pay his board and that of his wife and children too.   Mr. Hinchman remarked, with reference to the probability of their reunion, that it should be a *sine qua non,* that neither his mother, Samuel S. Richie, Elizabeth R. Shoemaker, nor some others, should be allowed to interfere, that he believed the chief difficulty had arisen from their interference; she answered, " Does thee think I've no judgment of my own ?"   The subject of the *trust* was then again mentioned, when she said, *if he did not, he must stay there till he could get out somehow.*

[ Hinchman *v.* Richie. ]

In July, 1847, Morgan Hinchman made his escape from the asylum, and immediately called on his uncle; he said, they had authorized him to leave, but would not consent to his going because he declined to go with Edward Richie. This was communicated to Richie, who said, he was not discharged; that he was more insane now than ever.

On the 13th of September, 1847, Morgan Hinchman presented his petition to the court of common pleas of Bucks county to quash the proceedings declaring him a lunatic and appointing a committee of his person and estate. And, on the 7th of February, 1848, after hearing depositions taken on both sides, the court set aside the inquisition and all the proceedings, on the ground that due notice had not been given to his near relations, as required by the act of assembly.*

On the 7th of November, 1848, John D. Michener, the commissioner before whom the inquisition of lunacy was held, filed a certificate in the court of common pleas of Bucks county, that he signed the inquisition finding Morgan Hinchman a lunatic, being ignorant that he had the power to refuse signing the same, or to grant him a *habeas corpus,* or to give him a fair hearing, or to insure him the right of self-defence; and that he did not intend by signing the inquisition to assert the truth thereof; and now certified (in conformity with the act of assembly) that there was not probable cause for the application: and further, that in withholding notice from his friends, he was not actuated by ill-will, but acted ignorantly, and as directed by the counsel employed against said Hinchman.

Mr. Garrett and Dr. Worthington were officers of the lunatic asylum. Benjamin H. Warder signed the order for his admission. Thomas Wistar, Jr., was shown to have taken part in the sale of the plaintiff's goods, and the removal of them from the farm.

A very great number of witnesses were examined as to

* See the opinion of Judge Krause, at the end of this case.

L

[Hinchman v. Richie.]

their belief in the plaintiff's sanity, who testified that he was a good farmer, and a shrewd business man.

The plaintiff having closed his testimony, *Mr. Gibbons* moved for the discharge of Dr. Evans, A. W. Hinchman, P. Garrett, Dr. Worthington, B. H. Warder, and Thomas Wistar, Jr., on the ground that they had been included wantonly and arbitrarily, and for the purpose of excluding their testimony; and cited *Wakely* v. *Hart*, 6 Binn. 316; *Brown* v. *Howard*, 14 Johns. 122; *Vandusen* v. *Vanslyck*, 15 Johns. 223; *Bates* v. *Conkling*, 10 Wend. 389.

*W. B. Reed* and *Perkins* opposed the discharge, and cited *Brotherton* v. *Livingston*, 3 W. & S. 334; *Bredin* v. *Bredin*, 3 Barr 81; 1 Greenl. Ev. § 358; Stevens' N. P. 1738; 4 Wend. 260.

*H. J. Williams*, in reply, 4 W. C. C. 79; 2 E. C. L. 465; *Child* v. *Chamberlain*, 25 E. C. L. 365.

BURNSIDE, J., refused to discharge the defendants, Griscom, Garrett, Worthington, Wistar or Warder; but charged the jury that there was no evidence against Dr. Charles Evans or Anna W. Hinchman, and directed them to bring in a verdict of "not guilty" as to them.

The jury rendered a verdict in favour of Dr. Evans, but refused to discharge A. W. Hinchman.

The defence set up was that Morgan Hinchman, at the time of his confinement in the lunatic asylum, was actually deranged; and that the defendants acted throughout with a regard to his welfare and convalescence.

It was shown, that the plaintiff was married to Margaretta Shoemaker, on the 15th of September, 1839, immediately before which *she had executed a deed of trust to her brother*, John W. Shoemaker, *whereby her estate was settled*

*to her own use,* reserving to herself a power of revocation; and on the 10th of September, 1842, she executed a deed of revocation, by which *the whole of her estate was conveyed to her husband,* Morgan Hinchman.

Much evidence was introduced to show that the plaintiff for several years prior to his confinement in the asylum had exhibited symptoms of partial insanity, having on one occasion, it was alleged, been guilty of violent conduct towards his aged mother. After his removal to the country these attacks, it was said, became more frequent and more violent, and so excited the apprehensions of his wife, that it was determined by his family to send him to the asylum for medical treatment.

Accordingly, on the 6th of January, 1847, his mother, in consequence of what his wife had communicated, called on Dr. Griscom, and requested him to come and hear the story from her own lips. The Doctor expressed his readiness to give a certificate of Morgan's insanity, if it was requested. On that evening, the plaintiff's wife, his mother, his sister, Anna W. Hinchman, Edward and Samuel S. Richie, and Elizabeth R. Shoemaker, met at his mother's residence, and upon a consultation between them, it was determined, at the desire and request of his wife, that Morgan Hinchman should be placed in the asylum. The Richies declaring that they would have no hand in it, unless it was the wish and desire of his wife, and unless all the others had made up their minds as to the necessity and propriety of the step. After his arrest, in the manner described by the plaintiff's witnesses, his mother called on Mr. Price, and directed the necessary legal steps to be taken, which resulted in the application to the court of common pleas of Bucks county for an inquisition of lunacy, as above stated. The inquisition was alleged to have been held, and the jurors selected, in the usual manner, the sheriff testifying that it was not the practice in such cases to examine the witnesses in the presence of the supposed

[ Hinchman *v.* Richie.]

lunatic; but that Morgan Hinchman did, in the present in-
stance, request to have counsel to represent his interests,
which request was evaded, Mr. Price asking him, if he was
not satisfied with *him* as counsel; and the proceedings went
on without allowing his wish for the presence of counsel
or friends to be complied with. The plaintiff left the asy-
lum on the 6th of July, 1847, after which he was regis-
tered as " discharged, restored to his usual health."

After his discharge, he requested Judge Stroud, who
was related to both parties, to see his wife and sister-in-
law, in reference to his return to his family. The Judge
called on Mrs. Hinchman, at her sister's residence in Ger-
mantown, when she said,—they expected him to return;
the house was open for him; that he could come and live
there, and go in and out at his pleasure. Elizabeth R.
Shoemaker, at the same time, remarked, that the house
was hers; her sister was living there with her children, and
of course he could not have control of her servants, or
over her domestic arrangements; but, in other respects, he
might remain there as unrestrained and comfortable as need
be. On the result of this interview being communicated
to the plaintiff, he flatly refused to reside at Germantown,
and declared that instead of returning to his wife, she
should return to him, with an acknowledgment that they
(or she) were all wrong, and he was right.

It was also shown that, by the rules of the asylum, on
the presentation of the certificate of a respectable physi-
cian, and the production of an order for admission signed
by one or more of the proper committee, neither the super-
intendent nor the resident physician had any power to re-
fuse to admit a patient. Benjamin H. Warder was a
member of the committee in January, 1847; he admitted
that he signed the order for the plaintiff's admission.

It was also testified, that the paper signed by John D.
Michener, purporting to be a return to the court of com-
mon pleas of Bucks county, as commissioner in the inqui-

sition of lunacy, was obtained from him by threats of a prosecution; it was obtained for the purpose of being laid before the meeting of Friends. Michener did not know, when he signed it, that it was addressed to the judges of Bucks county, but said, the part which referred to his ignorance was true enough.

The defendants having closed their testimony, *H. J. Williams* moved for the discharge of Benjamin H. Warder, for the purpose of offering him as a witness.

*W. B. Reed, Perkins* and *D. P. Brown* opposed the discharge, and cited *United States* v. *Harding*, 6 Penn. L. J. 17.

The court refused to instruct the jury to discharge B. H. Warder.

The plaintiff called witnesses to explain the alleged violent conduct on his part towards his mother. It appeared that Mrs. Hinchman was in the orchard, with his wife, knocking down apples from the trees, with a stick; that plaintiff several times requested her to desist; and on her persisting with great pertinacity, took her by the arm, to lead her from the orchard; she resisted in a state of much excitement, commenced screaming violently, and on his attempting to move forward with her, fell on her knees, and abused him in strong language. The next morning, she left his house: before her departure, Morgan came up, and offered her his hand, which she refused to accept; and, as the witness testified, gave him a good tongue-lashing; she said, "I cannot accept your hand, and unless you repent I never want to see you again." This occurrence took place in the summer of 1844.

It was also shown, that the paper was not got from John D. Michener under threats of prosecution. That the overseers of the meeting were present when Michener began to make the acknowledgment; and on a suggestion

that it had better be put in writing, the paper was executed by him, and witnessed by two of the persons present, one of whom testified, that the certificate was not forced from Michener for meeting purposes, but was given by him willingly, Morgan Hinchman declaring that it was intended to be filed in the office. At the same time, Hinchman gave Michener an acknowledgment in writing, that it was received in mitigation of the damages caused him by Michener's acts in the premises, and intended to end all differences between them.

The plaintiff also called additional witnesses to prove his sanity before and at the time of his incarceration in the asylum.

The defendants likewise produced additional witnesses as to the lunacy of the plaintiff; and to sustain the character of Mrs. Eliza W. Hinchman for veracity, and for her kind and affectionate disposition towards her children.

After a trial which had extended itself to an unprecedented length, (having been commenced on the 9th of March, 1849,) the jury were eloquently addressed by *S. H. Perkins, Esq.*, for the plaintiff; by *George Griscom, C. Gibbons* and *H. J. Williams, Esqs.*, for the defendants; and by *David Paul Brown, Esq.*, in reply; when the following charge to the jury was delivered, on the 9th of April, 1849, by

BURNSIDE, J.—Gentlemen of the jury:—I have reduced the charge I am about to deliver to you substantially to writing, and those points in which precedent is involved, I have written word for word. I do so because this is an exceedingly important cause, such a one as has never been tried in this state, and such a one as, I trust, will never arise again. But, if such a cause should ever arise again, I trust that whatever the supreme court shall decide

upon will be a rule for all men. I shall now proceed to offer you that charge.

I need not say, gentlemen, that I am deeply impressed with the novelty as well as the importance of this case. A correct determination of it requires our cool, calm, and deliberate attention, and our most deliberate reflection. Let us meet it in a way worthy of ourselves, without any improper feelings or prejudice, and with a strict regard to the law and the evidence: let us judge of it as we expect to be judged by Him who knows our inmost thoughts.

Conspiracy consists in an unlawful agreement, though nothing be done in pursuance of it: the conspiracy is the gist of the offence. Then, it is indictable, but it would not afford a civil remedy. So, a conspiracy to do a lawful act, if for an unlawful end, is indictable. Where men contrive and conspire to do an unlawful act, which oppresses another or unjustly subjects him to the power of those confederating, it gives effect to their purpose, either of extortion or mischief: such a conspiracy affords a civil remedy for damages, by an action on the ca se. I general, there must be a common design to do an unlawful act; when the fact of combination is established to the satisfaction of the jury, and the combination of the individuals in the unlawful enterprise is shown, or rather the connexion of the individuals in the unlawful enterprise, every act and declaration of each member of the confederacy, in pursuance of the original concocted plan, and with reference to the common object, is, in the contemplation of the law, the act and declaration of them all, and is original evidence against them all. It makes no difference at what time any one came into the conspiracy. Every one who does enter into such a common purpose or design is, in law, a party to every act which had been previously done by any of the others in pursuance of such common design.* This then, gentlemen, is a great, a settled principle of the law in rela--

* 1 Greenl. Ev. §§ 111, 233.

tion to this offence; and it is one which requires a court and jury to be careful that they do not involve innocent men, and also to take care that the guilty do not escape. I shall not enlarge upon it. It is, I admit, a charge easily made, and difficult to defend against. I am not for extending the law of conspiracy beyond its just limits—its settled principles; nor am I opposed to applying it to those to whom it ought to be applied.

You have heard, gentlemen, how Morgan Hinchman was arrested on the 7th of January, 1847, and taken to the Frankford asylum. Was he then insane? This is a fact for you to determine; and, in fact, it is the great, the leading fact in the cause. The learned counsel for the plaintiff contend that, as this proceeding was not upon oath or affirmation, it was contrary to the bill of rights, and a violation of the constitution of Pennsylvania. If you find, gentlemen, that Morgan Hinchman was insane at that time, I do not accede to that proposition; it would have been true if he had been charged with a crime; but the right to restrain an insane person of his liberty is found, as expressed by Chief Justice Shaw, of Massachusetts, "in the great law of humanity."

The Pennsylvania hospital was in existence half a century before the adoption of the constitution of 1790, and it was in existence and operation, as well as this asylum, when the amended constitution of 1838 was adopted. So that those gentlemen (and they were men of talent and distinguished ability, in both conventions, and especially the convention of 1790,) who formed this constitution, had the practice of the Pennsylvania hospital before them; and the late convention had before them, in addition to that, the practice of this asylum. I then negative the proposition, that it is a violation of the constitution of Pennsylvania, so to arrest and confine an insane man.

Gentlemen, these institutions are the pride of our state; they are the highest honours that the city and county of

[Hinchman v. Richie.]

Philadelphia possess. And there is no part of our population that have done more, that have expended more time and more money, to benefit the condition of the insane, and to erect and sustain these institutions, than the society of Friends. Perhaps they have done more than any religious denomination in relieving the condition of this unfortunate, but too long neglected class of society. I am not, gentlemen of the jury, for throwing any impediment in the way of these institutions; but, at the same time, as I shall show you, they are subject to visitations by the law of the land, like every thing else; and if they are abused, they are amenable to the common law.

Gentlemen, I am proud to say, that this is the first instance of alleged oppression in any of these humane or meritorious institutions. If wrong has been done, they are open to the examination of the civil courts, and the question will be, in each particular case, whether the safety of the person himself, or that of his family or friends or neighbours, required that he should be restrained for a time, and whether restraint is necessary for his restoration or will be conducive thereto. This is the great question. In considering this question of restraint, we must not fall into the vulgar error, that a person is not to be considered insane, when he does not always show wildness in his conduct, in his every day transactions. It is now ascertained and well established, by the investigations of learned men, and the light of science, that a person may show shrewdness in his business, and intelligence and cunning in his arguments, and still be decidedly insane on some one or more subjects; and if confinement or restraint, with regular medical treatment, are necessary for the restoration of such a person to a perfectly sound mind, they are the best friends of the party who enforce it. Illusions, which are deceptive appearances, and false views and hallucinations which are the acts, enlightening the mind, sometimes exist in persons who appear sound to the generality of their

neighbours.  This species of insanity will show itself in outbreaks of passion, occasionally in sullenness, and in various ways, to the parents, wife and children of a man, when those who frequently visit him will not discover it.  I entertain for our insane hospitals the highest gratitude; they often confer on the miserable and unfortunate maniac the restoration of mind and health; and those who erected them with their money, and who devote their time and attention to these institutions of benevolence and charity, at no profit to themselves, are deserving of the highest praise. Our legislature are now erecting, at Harrisburg, an asylum for the insane poor, the first appropriation for which was, I think, one hundred thousand dollars, at the expense of the tax-payers of the state.

I return to the question, whether or not Morgan Hinchman was partially insane.  That question is for you to determine from the evidence, and, in calling your attention to this, I call it to the whole evidence.  For me to read the whole evidence to you, would take a day or two, and it has been so recently discussed, so recently and so elaborately considered by the counsel on both sides, that I deem it unnecessary. · Your minds have been kept to this cause as closely as I could occupy them, from the commencement to the present time.  But, gentlemen, I ask you this question, —Did not Morgan Hinchman's mother and his wife think that he was insane?  Was it not at their instance that he was removed to the asylum?  It is urged by the learned counsel who last addressed you, that the wife had no hand in it, and was imposed on.  I am unable to discover in the evidence any foundation for this position.  Is there not evidence that Samuel Richie said he would have nothing to do with it, unless it was the desire of Mrs. Morgan Hinchman?  Does not the whole evidence show that she was at Mrs. Eliza W. Hinchman's when the whole matter was concocted?—when the determination was come to, to take Morgan Hinchman to the asylum?  You have heard

who were there. There is one thing that struck me as remarkable. This old lady seems to be no common woman. It appears she was left a widow when she was a young woman, with five or six very young children. On the death of her husband, her means were not very extensive, and yet some of her children appear in court, and they have an education and intelligence which would do credit to the most wealthy of the commonwealth. You have the testimony of the mother, and you are the judges of it. She solemnly affirms that she made the application; she came to her son's friends to have him removed to the asylum, because she loved him, as she no doubt did, and because she thought it would improve his health. The affair in the orchard was an unfortunate occurrence, and I submit to you, as rational, intelligent men, whether it was possible that revenge could rankle in the mother's bosom, from an occurrence of that kind, for so long a time. You, and not I, are to judge of it. Although the mother did not visit the son, yet the son, occasionally, as you have heard, called on her on business. And is it possible that such a diabolical spirit of revenge could exist in a mother's heart such a length of time? That she gave her sanction to his removal to the asylum, that it was at her desire that he was removed thither, that she was the great cause of that removal, is to me manifest; but I submit that to you.

With regard to the wife, the evidence, as far as I can judge, is that she was a mild, a kind, an affectionate wife; she was the wife of his bosom, she was the mother of his children, his partner for life, for better and for worse. If he was subject to spells of unhappiness and disorder, she knew it better than all others. I submit to you, that she knew the very throbbings and pulsations of his heart, and that if he was disturbed and disordered, if he was agitated with disease, she knew it best. Why did *she* consent to his being sent to the asylum? What loving, kind and affectionate wife ever desired to destroy her own happiness

by disgracing or distressing her husband? Gentlemen, I make these observations to you in order to bring them to your minds, because this case presents some features that are very extraordinary indeed. What then was the object of placing Morgan Hinchman in the asylum? Was his mind diseased, as Dr. Evans informs you, and was it to restore him to health, wife and family, and friends and happiness, that he was confined in the asylum, or was it for some mercenary purpose, as is alleged? If it was for his benefit, as his friends honestly believed, and they had reasonable cause for that belief, that he was partially insane, and you are satisfied of that insanity, this action will not lie, and cannot be maintained. On the other hand, if he was placed there for a mercenary purpose; if he was placed there, as alleged, *in order to obtain a deed of trust of his property for his wife and children,* the plaintiff will be entitled to your verdict. The first evidence which tends to support the mercenary view of the case is that of Jonathan Smith; he says he thinks he heard Morgan Hinchman and Mr. Garrett talking about a deed of trust, and settling affairs. "It was Mr. Garrett," said Mr. Smith, "I heard say it; then, he said, he would be well enough in a short time, and get out:" on the cross examination on that point, he added, "as I passed through, Garrett said, that *if he would sign the deed he would soon be well, and all would then be right, and then he'd get out.* You have heard Mr. Benjamin Hinchman: he says, that in a conversation with Edward Richie, about an interview with Margaret Hinchman, Edward Richie said, that "*if Morgan Hinchman would allow his property to remain in trust for the benefit of his family, he might come out of the asylum as soon as he pleased;*" and that he (Richie) wished, "*that Morgan would put his property in trust, and then there would be no objections to his coming out.*" You have also heard what the wife said, or what Mr. Benjamin Hinchman stated, that she said to him. He states, that she said, "*that if he* (Morgan)

*assigned it* (his property) *over, he might come out, but if not, he might get out as he could.*" You have also heard the conversation which Abraham Sink heard between Dr. Worthington and Hinchman: he (Sink) says, "*I have heard Dr. Worthington speak of his property; Dr. Worthington advised him* (Hinchman) *to give up his property; that he would not live with such a woman like her again, but would go to Texas; property without liberty would be of no use to him.*" If, then, Morgan Hinchman was placed in this asylum for the mercenary purpose of getting him to convey his property in any way, it was a foul conspiracy: if it was honestly and conscientiously done, for the purpose of restoring him to health, they conscientiously believing him to be diseased, and you should be of that opinion, it presents a case in which, as I have told you, the patients may be taken in charge by relations and friends, by wives and by mothers. And if I have a wish on the face of the earth, if it should please God to visit me with such a misfortune, I would hope that my wife and children would cause me to be removed to one of these institutions, which are an honour and a blessing to your city and county.

It appears that the plaintiff and his wife, when they were married, were about equal in wealth. He very generously executed a deed of trust for the benefit of his wife, but unfortunately there was a power of revocation. And I tell you, gentlemen, and all who hear me, that if any one wants to settle any property on his wife and children, he will not put it in the power of husband or wife to alter or change it, because my own observation is this:—I never knew one instance in the whole course of my life, where the husband could not by some means or other obtain the consent of his wife to make a change; he will do it by love or affection, or if that will not do, he will too often do it by bad treatment. They (Hinchman and wife) did change it, and that property possibly depreciated in value, as you have heard; his money wasted some, no doubt. Whether the wife, and

[ Hinchman v. Richie.]

the friends of the wife, wished to obtain for her permanent possession of the property, by placing him in an asylum, in order to secure to her a competency, is for you to determine. And if they did pursue that course, and if you are satisfied that he was a sane man, or rather, that he was not an insane man, it was a mercenary purpose, and one which will support the *narr.*

Now, gentlemen, as you will see, I have reduced this cause to a simple inquiry; I have endeavoured to bring it before you in the simplest possible form, in order to lessen your duties; and I consider it the duty of a judge to bring questions before a jury, in such a manner that they will fairly understand and fully comprehend them, and then they are the persons to decide. And while I shall never permit a jury to encroach upon the right of the court, in matters of law, I, on the other hand, shall be the last man to meddle with a jury on matters of fact.

I shall now, as briefly as possible, answer the defendants' points, and they are really multiplied to an extraordinary extent. I suppose the notion is, that a man who comes from the Allegheny mountains knows nothing about the laws of Pennsylvania.

1. That unless the jury are satisfied that the defendants procured the commission of lunacy to be sued out by the mother, the plaintiff cannot recover on the first and second counts in the *narr. Ans.*—I agree to this, with the exception that the jury will recollect that the decision to place him in the asylum was come to on the 6th; that he was carried there on the 7th; that application was made to Mr. Price on the 8th; and that the petition was signed on the 9th, and immediately forwarded to Doylestown. The jury will judge whether the proof is such as to satisfy them, that it was a part of the original concoction, to take out the commission of lunacy, and to take it out for an improper purpose.

2. That the suing out of a commission of lunacy cannot

[Hinchman v. Richie.]

be ground for this action, unless it was done, or procured to be done, by the defendants, and was done by them maliciously and without probable cause for believing the plaintiff to be deranged, and that it is the duty of the plaintiff to establish, both malice on the part of the defendants, and the want of probable cause. *Ans.*—I accede that the suing out of the commission was a legal proceeding, and that the plaintiff must for that show malice, and the want of probable cause.

3. The defendants cannot be found guilty, under the second count, unless it is proved that they did conspire to take the plaintiff, and confine him in the asylum, for the purpose of enabling some of the defendants to get possession of his property—that being the conspiracy charged in that count. *Ans.*—The conspiracy must be substantially proved as averred in the count, that two or more of them did conspire for the purpose of enabling some of the defendants to get possession of his property, as charged.

4. That the defendants cannot be found guilty under the third or fourth counts, unless it is proved that the defendants conspired to confine the plaintiff, to get possession of his property, and to compel him to settle the same on his wife and children. *Ans.*—I have already substantially instructed the jury as desired, upon this point—that the plaintiff must substantially prove the case he sets out in the declaration.

5. If the defendants believed that the plaintiff was deranged, and required for his recovery medical treatment, under restraint, the verdict must be for the defendants. *Ans.*—The general charge instructs the jury on this point; I accede to it.

6. That the taking of the plaintiff to the asylum, and his detention there, even if unlawful, and a trespass, are not acts for which the plaintiff is entitled to recover in this form of action. *Ans.*—Certainly not; unless there was a *conspiracy* for that purpose.

[ Hinchman v. Richie. ]

7. That if the defendants acted under circumstances, such as would have induced a man of ordinary intelligence to believe the plaintiff insane, and requiring medical treatment in an asylum, the plaintiff cannot recover. *Ans.*—I accede to this, if the jury find it was their only motive to restore him in health and soundness to his family.

8. That the application of the wife and mother, accompanied by their statement that the plaintiff was deranged, constitute probable cause, if circumstances warrant a reasonable belief of insanity or unsoundness of mind. *Ans.*— There are no relations so near or dear to the affections of a man as his wife and mother, and every presumption is in favour of their affection and regard, until the contrary is shown. I cannot say, under the immense mass of contradictory evidence in this cause, that the application of the wife and mother, accompanied by their statement that the plaintiff was deranged, constitutes probable cause. I leave it to the jury to determine whether the circumstances proved warrant a reasonable belief of insanity or unsoundness of mind. I can only say that if he *was* insane, it was probable cause.

9. That, if even there were any evidence of any of the plaintiff's property having been disposed of by any of the defendants, and the proceeds not accounted for, it would not be evidence to support this action. *Ans.*—It is not evidence to prove a conspiracy, and support the action; but, if a conspiracy is proved, the fact done in furtherance of it would be evidence to increase the damages.

10. Knowledge of the existence of a conspiracy must be brought home to every defendant, otherwise, his acts do not make him a party to the conspiracy. *Ans.*—They do not, unless the act is done in pursuance of the originally concocted plan, and with a reference to the common object. If it is done in furtherance of the common purpose, he is, in law, a party without regard to the time he entered, which is for the jury.

[*Hinchman v. Richie.*]

11. Receiving a patient, with the usual certificate and order of the asylum, unless known that he was brought there by a malicious and unlawful conspiracy, does not make the superintendent and resident physician conspirators.   *Ans.*—Certainly not, as to the abstract fact, it does not make the superintendent and resident physician conspirators, unless they reported corruptly to the managers to keep the patient there, in furtherance of the conspiracy.

12. Signing an order of admission of a patient, on the application of his mother, accompanied with the certificate of a regular physician, in the usual form, and in the usual bond, is no evidence of being a party to the conspiracy laid in the *narr.*   *Ans.*—To this I accede fully as to the abstract proposition.

13. Signing a certificate by a medical man, that he believes the party to be insane, is no evidence of being a co-conspirator, unless previous knowledge of the existence of a malicious conspiracy is brought home to him.   *Ans.* —I fully accede to this.

14. None of these defendants can be made answerable for any act done while serving on the inquest, as one of its members, nor for his decision or verdict as such.   *Ans.*— I feel it my duty to make this further answer to the 11th, 12th, 13th, and 14th points.   I instruct the jury, that the officers of the institution ought not to be subject to an action for damages, or held responsible in this action, unless they had knowledge that the plaintiff was sent there for an improper purpose; or, after he was there, they corruptly joined in keeping him there, for an improper purpose; nor the physician, unless he gave a corrupt certificate; nor the jury of inquest, unless they had themselves fraudulently placed on the jury for a corrupt purpose.   You understand me, gentlemen.   You have heard the rules of this institution read, to a certain extent.   It is conducted by twenty managers.   They say, when a patient shall be received, and when discharged.   When a physician, having no im-

M

[ *Hinchman v. Richie.* ]

proper connexion with the matter, honestly gives his certificate that a man is insane, and conscientiously believes that he *is* insane, he (the physician) is not liable in an action. If a man is a superintendent there, as was Mr. Garrett, who it seems was very kind to every body, (the only fault that I can see in him, is his conduct in relation to the letter) he has no power to refuse receiving a man, nor has he any power to discharge him; and unless there is evidence that he joined corruptly in keeping a man improperly there, I would not find him guilty; because then no man would accept such a place, and it is all-important that such institutions should be kept up, and that their officers should be respectable and intelligent men. So with Mr. Warder: what did he do? He was one of the fellow members who signed the order for the admission of Morgan Hinchman, and which on its face is all very regular. Unless he did that corruptly, he ought not to be answerable. His duty was performed when he gave the order for the admittance of Hinchman to the asylum: and unless he joined as a manager in corruptly keeping him there, (and the evidence on that point ought to be perfectly satisfactory, before you find him guilty,) Mr. Warder ought to be discharged. I will take up the case of all the defendants in regular order hereafter. But to return to the defendants' points. We now come to the 15th and 16th points.

15. The finding of the inquest, that the plaintiff was insane, is a justification of the arrest and confinement, so long as it is necessary for the health and improvement of a party.

16. The finding of an inquest, that a party was insane, is a justification of the arrest and confinement, so long as it is necessary for the health and improvement of a party. *Ans.*—These two points run into each other, and they will be answered together. The inquest, as well as the whole proceeding, has been attacked on the ground of fraud.

Fraud may poison a record, which may include the solemn finding of a jury, as well as a deed or any species of contract. The allegation is here, that the whole proceeding was done under circumstances of contrivance; the selection of jurors is said to have been fraudulent. If so, the whole proceeding was fraudulent, and they were an illegal body, sitting on a sound and sane man, in an insane asylum, for a corrupt or illegal purpose. If, on the evidence, the jury should be of that opinion, then I instruct you that the fraudulent finding of the jury was no justification, before it was set aside, of a fraudulent arrest. If you find to the contrary, that there was no fraud, then the finding was *primâ facie* evidence, before it was set aside, and the position of the defendants' counsel is correct.

17. The court of common pleas of Bucks county, *and the court only*, had authority to direct to whom, and what notice should be given of the inquest; and if no such notice was given, the omission cannot be imputed as a fault to any of the defendants. *Ans.*—I accede to this; the act of the 15th of June, 1836, § 6, *Purd.* 782, provides that "it shall be the duty of the court, at the time of granting any application, to make such order respecting notice of the execution of the commission, to the party with respect to whom such commission shall be issued, or to some of his near relations or friends, who are not concerned in the application, as the said court shall deem advisable." It is true, the court made no order; no notice was given either to the party himself, or to his paternal relations. The first thing he knew, he was brought down and examined before the inquest. But it was not the fault of the defendants, but of the court in not making the order.

18. The finding of the inquest, fairly summoned and having fairly decided, is proof of probable cause. *Ans.*— This is answered in the affirmative; if the jury believe that the defendants were actuated by no improper motives, in arresting and confining this man, and it was not done to prevent a fair trial, I accede to this point.

19. If the jury believe that the defendants acted at the solicitation of the plaintiff's wife and mother, and upon their representations that he was insane, *without malice or interested motive*, the plaintiff cannot recover in this action. *Ans.*—This point is fully answered in the general charge.

Mr. Griscom thinks his brother (Dr. Griscom) stands on different ground from the other defendants, and has put ten additional points to the court. The jury will take the answers already given according as they apply to Dr. Griscom's case, but I will examine them and give such further answers as I deem necessary.

20. That if the jury are satisfied from the evidence, that Dr. Griscom had no acquaintance, connexion, or consultation, with the other defendants, or any of them, nor with any other person or persons, with reference to the taking or placing of the plaintiff in the asylum, previously to that design having been matured and acted upon by others—and then only gave *professional opinion*, at the request of the mother and wife, without any connexion, concurrence, or co-operation with any of the other defendants—then he is not liable. *Ans.*—If the jury find that such are the facts, I accede to it.

21. There is nothing alleged against Dr. Griscom, (according to Mr. Perkins' summing up,) in the argument for plaintiff, except that he *advised* the plaintiff to acquiesce in the design of those who *did* take him; and all the proof shows that any advice which he gave, was imparted to plaintiff by Dr. Griscom, solely and purely with a view to the good—the medical aid and benefit of the plaintiff—the medical opinion and advice thus imparted being entirely independent of the idea of plaintiff going to the asylum, as a part of the treatment, unless at his (plaintiff's) own free will and choice. *Ans.*—If the jury find the facts as stated, I agree to this.

22. That the jury may presume, from all the testimony taken together, and particularly that of Eliza W. Hinch-

man, as well that Dr. Griscom went to the tavern to oppose, as to forward any design to take the plaintiff to the asylum, unless by his (plaintiff's) free will and choice. Mr. Hinchman's testimony showing that he declined *advising* such a course, (when he referred her to friends of her own meeting;) and that, so far as any action or advice of his went, it is not shown that he did, while there, approve of any resort to compulsion, and that, if not, he is not liable. *Ans.*—It is for the jury to say how Dr. Griscom went there, and what part he took.

23. That, as there is no proof that Dr. Griscom ever had any knowledge or connexion, or in any way was ever consulted or conferred with by the other defendants, or any of them, or any person whatever, with regard to the *property*, or any disposition of it, or any of the business or domestic affairs of the plaintiff, or any subject relating to these subjects, at any time; but that the proof is positively and clearly the contrary, by Eliza W. Hinchman's testimony, and all the evidence in the cause; he cannot be held liable on these charges. *Ans.*—The jury are the judges of the motives, and the part Dr. Griscom took, and will apply the law to the case as already explained.

24. That malice express or implied is essential, and that it cannot be presumed against Dr. Griscom, from all the testimony, but altogether the contrary. *Ans.*—This is a question for the jury.

25. That the *professional advice*, or opinion of a physician, given to any one to whom he is called to give it, honestly and truly, with intention to benefit the health of the person advised, without any other action on the physician's part, (excluding the idea of mal-practice, of course,) cannot, in any case, subject the physician to an action for damages. *Ans.*—Undoubtedly, where a physician gives a certificate, honestly and *bonâ fide*, he ought not to be subjected to damages.

26. That any opinion expressed by Dr. Griscom, as to

[ Hinchman v. Richie. ]

the cure of Morgan Hinchman, can no more subject him to punishment or damages as a conspirator, than can the opinion entertained, expressed, and acted on by Dr. Evans, subject him thereto. *Ans.*—The first part is a matter of fact for the jury to determine; and if they find that he was a *sane* man, and there was a conspiracy, and his acts were in furtherance of that conspiracy, he is a conspirator.

27. Dr. Griscom cannot be made liable, unless the jury are satisfied, from the evidence, that he entered, at some time, into the *conspiracy*, with the common design or purpose, with others, to effect what is laid in the declaration, to wit, to seize and incarcerate the plaintiff, to get possession of his property; compel him to make disposition of his property; to corrupt and pervert the mother's and wife's minds, to turn them against the plaintiff; to influence the mother to sign and affirm to the petition to institute proceedings in lunacy, &c. (See 1 *Greenl. Ev.* § 111.) *Ans.*—If the jury find the facts as there stated, undoubtedly, he ought not to be liable: I agree to this.

28. That conspiracy is the *gist* of the action. *Ans.*—I concur in this.

29. That *malice*, want of *probable cause*, and damage to the plaintiff, must all concur, and be proved, to enable plaintiff to recover. *Ans.*—I do not exactly go that far: this is true, if the jury believe he was honestly placed in the asylum for the re-establishment of his health and mind.

Now, gentlemen of the jury, I will take up each defendant's case, commencing with that of Dr. Griscom. From all that appears in this case he is a man of excellence and worth. It appears that he was the physician of Morgan Hinchman, his family, and of his mother, and that he was a friend of Morgan Hinchman. The mother went to him, and asked him to go to the Red Lion hotel. There is no evidence to show that she communicated any thing to him except that her son was insane, and that he was about to be taken to the asylum. Now, was he honest in that im-

pression? If he was honest in it, and if he really did
nothing but clap him on the back and say—"Come, my
good fellow, you are insane, go to the asylum, and go
peaceably and quietly,"—if that is all Dr. Griscom did, I
would be inclined to say that he ought not to be found
guilty, and I presume the jury will not convict him under
these circumstances. But if the jury believe that by his
presence, his aid, and appearance, Morgan Hinchman was
induced to yield to the plans of those who had assembled
there for the purpose of carrying him to the asylum, and if
they believe that Morgan Hinchman was of a perfectly
sound mind, and that he was taken from that tavern for
the purpose of extorting from him a conveyance of his pro-
perty for the benefit of his family; if Morgan, in conse-
quence of the presence and acts of Dr. Griscom, was pre-
vented from clearing out and running away, then you must
consider Dr. Griscom a party to the transaction, and I
submit it to you upon these principles. I have no doubt
that Dr. Griscom is a most excellent man; these defendants
are all gentlemen, and clever men. I have no doubt some
of them acted hastily, and I will put the case as fairly for
them as they can possibly ask, or any citizen require;
that if the action was *bonâ fide*, and they had reasonable
cause to believe that Morgan Hinchman was an insane
man, and required restraint and confinement, they ought
to be discharged. And this is the first time that the
question has been decided in Pennsylvania to this extent.
But if the restraint and confinement of the plaintiff were
effected for a mercenary object, which you are to determine
from the evidence, of which you, and not I, are to judge,
it is a different case, and an action for damages will lie.

The jury will bear in mind, that it is their duty to find in
favour of those defendants against whom there is no proper
evidence, and who do not come within the principles on
which they have been instructed, as conspirators. As to
Anna W. Hinchman, my mind has been, and is strongly

inclined in her favour, and I will submit her case to you. She was present at her mother's, when it was decided to take her brother, Morgan Hinchman, to the asylum. There is no evidence, that I can discover, that this daughter said any thing; there is no evidence that she opened her lips on that occasion; and it could scarcely be expected, that she would resist her aged mother. And, unless there is evidence that she encouraged her mother, it seems to me, that I would not convict the child of any woman, under such circumstances, of a conspiracy. You understand me, gentlemen; there is no evidence that she encouraged her mother, if there was, it would present a different case: she was present; and is it really to be expected, that an amiable daughter would resist a venerable mother, in a thing of that kind? You, gentlemen, will judge of her, on the principles I have stated.

Mr. Garrett is the superintendent of the asylum; as I have already remarked on this case, this gentleman had no discretion at all, under the rules of the institution. If he did say what you heard, about Morgan Hinchman conveying his property, he had no power to discharge him; and is not that a circumstance in his favour? Unless the jury are satisfied, from the evidence, that he afterwards joined and combined to keep Morgan Hinchman illegally in confinement, they should find in his favour. The same principle applies to the case of Dr. Worthington; unless he joined in the conspiracy, after Morgan's confinement, he also ought to be discharged. He had no power to discharge any patient, he could only report to Dr. Evans; and unless there is some evidence that he acted corruptly in reporting to Dr. Evans, the visiting physician, the jury should find in his favour. It seems to me, and I have said, that my feelings are in favour of the asylum, unless there was evidence of a concocted plan.

Benjamin H. Warder is in precisely the same situation as Dr. Worthington, and Philip Garrett, the superintendent.

According to the rules of the institution, it seems, that it was his duty to give an order for the admission of any patient, on the certificate of a respectable physician. Unless he did some corrupt act to further the confinement of a sane man, you ought to give a verdict in his favour.

As for Dr. Kite, if he were not in the original conspiracy, and gave a conscientious certificate, I would not hold him responsible; nor do I see the legal principle upon which he can be convicted. His conviction would deter physicians from giving their certificates, and have an unhappy effect upon society. But, really, did he give a corrupt certificate? If the jury believe that Dr. Kite did give a corrupt certificate, it would materially alter the case, and there is one thing that makes against him; he stated, according to the evidence, that *he had not seen the patient in four months;* this, I think, is the strongest feature in his case. The rules of the institution do not require that the certificate should state, when the examination, upon which it was based, was made. The British statute requires that the certificate should state, when the examination was made, which must not have been made more than seven days previous to the date of the certificate; and then, two physicians must be present at the examination. If the managers of this institution would take my advice, they would adopt the provisions of the British statute, and require that all examinations should be personal, and it should be stated on the certificate when they were made. However, gentlemen, it is for you to judge of Dr. Kite: for the mere giving of the certificate, I would not find him guilty, unless you believed he certified falsely; if he acted conscientiously, I think he ought to be discharged.

I put Mr. Biddle on the same principle; if he acted honestly as a juror, he is not liable, and ought not to be held liable; but if he had himself placed on that jury for the purpose of having Morgan Hinchman convicted of insanity, then he comes in with the others. If you believe,

as the sheriff swears, that the jury was fairly selected, and Mr. Biddle was fairly placed on it, then you ought to discharge him; and I leave him with the rest to you.

With regard to Thomas Wistar, Jr., his first appearance in this drama was after the confinement of Morgan Hinchman, and after the sale of his property. For, although one witness thought he saw him at the sale, I think, it is clearly proved he was not there; however, that is for you to decide. There certainly is no evidence that he had any thing to do with the original concoction. The mother wanted to see him, but did not; there is not a particle of evidence that he had any thing to do with placing Morgan Hinchman in the asylum: all his acts were subsequent to that transaction; he did nothing but acts of kindness to Mrs. Hinchman, who, say what you please, is an unfortunate woman, and I certainly would not convict him of conspiracy for doing acts of kindness, after the conspiracy had been concocted, (if a conspiracy was formed, at which he was not present) unless those acts of kindness tended to further the conspiracy, and were designed for that purpose. I then say, that if the jury are satisfied that Thomas Wistar did nothing to further the common design, he ought to be discharged.

And I submit it to you, gentlemen, that, if there was a conspiracy, Samuel and Edward Richie, as well as Elizabeth R. Shoemaker, were at its concoction: Mr. Lippincott, Mr. Elkinton, and Mr. Whitall were not there, but helped to arrest the man. For these six defendants I have nothing to add; if you believe, that on the 7th of January, 1847, Morgan Hinchman was a sane man, and they, or any of them, maliciously caused him to be arrested and imprisoned in the Frankford asylum, they are all by law subject to the consequences. I think it is due to Mr. Lippincott, to Mr. Whitall, and to Mr. Elkinton, to say, that I am fully satisfied in my own mind, that they had no intention to violate the law of the land. But, if the Richies, with the mother,

had this man arrested, when you are satisfied that he was perfectly sane, their joining in the act of arresting him and taking him to the asylum, makes them, in law, principals, and it is not in my power to exonerate them. I cannot change the law; I am bound, as I am answerable to my God, and to my country, to declare the law as I believe it to be: I have done so, and however hard I may think it, I cannot help it; they are principals, if it was a corrupt design to take a sane man to an insane asylum.

To conclude, I have told you that, if Morgan Hinchman was a partially insane man, who required medical treatment, and if he was placed in the asylum for that purpose, and for that only, the plaintiff ought not to recover. But I think it my duty to say to you, and from that duty, with the blessing of God, I will never shrink, that it seems strange to me, that a man who is sober and industrious, a good farmer, capable of attending closely to all his duties, kind to his wife and children, but who, no doubt, like other men, had some oddities, was insane. In these cases, say the supreme court, in *M'Elroy's Case*, (6 W. & S. 451) " the question is, was he deranged to such an extent as to disqualify the traverser " (in an appeal from the inquisition of lunacy) " from conducting himself with personal safety to himself and others, and from managing his own affairs, and discharging his relative duties." Depart from this rule, and where shall we be? Now, I have reduced the cause to this simple inquiry; if you are satisfied that Morgan Hinchman was so partially insane that it was dangerous to himself, dangerous to his wife, and dangerous to his children for him to be at liberty, and that these defendants acted from pure motives, and placed him in the asylum for the purpose of restoring him to health—restoring him sound to his family, I hold them justified. On the other hand, if they placed him there for a mercenary purpose, they, the six to whom I have referred, and against whom there is some evidence, of which you will judge, ought to be mulcted in damages.

[ Hinchman *v*. Richie. ]

I say, gentlemen, that I have brought this cause to a simple issue. It is an important cause, and it is one which you are to determine; I want you to do it coolly, and calmly, and deliberately, apart from excitement of any kind: judge from the evidence, judge as you expect to be judged hereafter: I know the ground I have taken, and that I have endeavoured to do my duty conscientiously. If the man was a sane man, and you so find, and they knew that he was sane, and concocted the scheme for the purpose of obtaining a deed of trust, it is an aggravated case. Yet, do not suffer yourselves to be carried away, still act with deliberation and coolness; do not suffer yourselves to do injury by giving excessive damages, which would tend to impoverish and ruin the families of the defendants.

Gentlemen, I have nothing more to say; I am satisfied in my own conscience, that I have done my duty in this cause, and I leave the result of it to you.

The jury found a verdict in favour of the plaintiff, against Samuel S. Richie, Edward Richie, John Lippincott, George M. Elkinton, John M. Whitall, John L. Kite, and Elizabeth R. Shoemaker, and assessed the damages at $10,000; and in favour of the other defendants.

The counsel for the defendants, against whom a verdict had been found, moved for a new trial; and also in arrest of judgment, alleging that the third and fourth counts were improperly joined with the others, and also that the offence laid in the *narr.* is trespass and false imprisonment and not the subject of an action on the case. On the 21st of April, 1850, the court refused the rule for a new trial, overruled the motion in arrest of judgment, and entered judgment on the verdict.*

---

\* If a person be so insane that it would be dangerous to suffer him to be at liberty, any person may, from the necessity of the case, without warrant, confine him for a reasonable time, until proper proceedings can be had for the appointment of a guardian; and if, before measures can be taken for the appointment of a guardian, he become sane, and be released, the party con-

[ Hinchman *v.* Richie. ]

fining him will not be a trespasser. No one, however, has a right to confine an insane person for an indefinite period, until he shall be restored to reason, but upon compliance with the formalities of the law. *Colby* v. *Jackson*, 12 N. H. 526. A person proceeded against as a lunatic, except in cases of confirmed and dangerous madness, is entitled to reasonable notice of the time and place of executing the commission, and a reasonable time to produce his witnesses before a jury. The jury, upon the execution of a commission of lunacy, have a right to inspect and examine the lunatic; and they should do so, in every case of doubt, when practicable, and should direct the person in whose custody the lunatic is, to produce him, or to permit him to attend before them. *Russell's Case*, 1 Barb. Ch. 38.

The opinion of the court of common pleas of Bucks county, setting aside the proceedings of the inquisition of lunacy, in the case of Morgan Hinchman, was delivered on the 7th of February, 1848, and is here subjoined, in order to complete this important cause.

In the matter of the Inquisition finding Morgan Hinchman a Lunatic.

KRAUSE, President.—These proceedings show defects that cannot be overlooked, and which would be fatal under the act of 13th June, 1836, if even there had not been too great haste in executing the commission and placing Mr. Hinchman under disability as a lunatic. The 6th section requires the court to direct notice, either to the party in respect of whom the commission shall issue, or to some near relations or friends, who are not concerned in the application, and the object being to procure a defence when that may reasonably be made, it is obvious that such as counsel a finding against defendant, or desire it, are excluded from that list of persons, as ineligible to stand in his stead. For some purpose or other this direction was not asked of the court: and notice was not given by the commissioner. Nor could he have given any that would be held timely from the 1st to the 5th February, the space he allowed to intervene between the presentation of the petition and the meeting of the inquest. The idea seems to have been entertained that to have blood relations present, though known to be against the party, was enough to satisfy the letter of the law; and consequently, his friends who might have stood in his defence—who might have brought forward the numerous witnesses in Bucks county and Philadelphia, who now testify he was a sane man, and thus have carried out its spirit—had no information of his confinement, or the causes for restraining him of his liberty, or the time and place fixed for the trial. Nor was he himself summoned beforehand, or brought in at the time to be present at the examination of the witnesses, on whose testimony he was pronounced incapable of exercising the rights and duties of husband, father and citizen. He was in fact not present for any purpose of defence, but for exhibition merely—a conclusion that is forced on the mind by the whole course of conduct; for the witnesses had been heard when he was called into the room; his desire to have friends and counsel to aid him, was disregarded, and the business affecting all his high interests was concluded after he had been removed. In *Ex Parte Cranmer*, 12 Ves. Jr. 455, Chancellor Erskine says, " the party must certainly be present at the execution of the commissioners; it is his privilege:" and such must be the construction of our statute, except where, from the necessity of the case, it

[Hinchman *v.* Richie.]

is impracticable to give literal force and operation to the principle, as in the state of facts instanced in the third division of the second section, by which a commission may be executed against an inhabitant of the state, who is absent from it, in the county containing his real estate. But that is justified on the ground of its being a purely beneficial measure, to save the property from impending mischief; and, to prevent oppression, the court exacts ample proof that such is the object, and directs extraordinary efforts to be made, by publication or otherwise, to reach the party with notice. In all other cases provided for by the act—as well that under consideration as that where the alleged lunatic is in the commonwealth, but has no fixed residence—he is followed, and the commission is executed where he is found, that this privilege of being present may be secured to him, and secured not merely for exhibition of him to the commissioner and inquest—though that is doubtless one purpose—but also to give him full opportunity of defeating proceedings improper, for the want of foundation or legal conduct in any of its stages. It would be unprofitable to add other reasons for setting aside the inquisition. It is indeed impossible to sustain it against the fundamental objections that have been stated. But it may be added, that another commission cannot be issued by the court on the petition in this case, if such a thing should be desired. Pecuniary inconvenience is not that which the act contemplates as a ground for not appointing the trial at the party's residence. 16 Ves. Jr. 340. And here he resided on his farm in the county, actively, and as his neighbours testify, intelligently engaged in his proper vocation, unsuspected of any mental disorder, except by a few relations and others, who took their impressions from reports, or had their preconceptions from slight causes thus strengthened. In this condition he was surprised in Philadelphia, whither he had gone to sell his produce in the market, with the announcement that he was thought to be deranged—that he must abandon his affairs and go into confinement—and on the certificate of a physician who had not seen him for months, was made an involuntary inmate of the asylum at Frankford. Neither his health nor any known disposition to inflict injury on his friends or himself required such restraint as a measure of safety. Some occasional irregularities in his conduct are traced up from 1839 to 1847, and aggregated to found the fact of a distempered mind, and warrant this summary process; but at the time it was executed upon him he farmed well, made his bargains well, settled his accounts exactly, paid as punctually as most debtors, and had the good opinion of his neighbours, who, with few exceptions, esteemed him as a good housekeeper and farmer, as well as an intelligent citizen. A few of his acts may be considered blame-worthy, in the relation he bore to the parties complaining of them; but, on the testimony, they may well be ascribed to provocations which ought to have been avoided in his circumstances—at all events, one would think, it required but little charity to place them in the category of common occurrences in men's lives who are touched, as he is said to have been, with the infirmities of a nervous constitution. This seems to have been his misfortune, but the evidence does not satisfy the court that it affected his mind to any extent, for which an affectionate or discreet deference to his opinions and plans for a frugal husbandry, whilst the pressure of debt remained on him, would not have been the best remedy. His friends near him, however, thought otherwise; and had him declared a

[Hinchman *v.* Richie.]

lunatic, on the testimony of physicians, who, to say the least, give us but a vague account of the moral insanity under which they believed him labouring. It is not necessary, on the question now before the court, to examine into the truth of that finding for more than to see whether it was inconvenient, in a legal sense, to have removed him to his residence for the purpose of executing the commission. The petitioner may have considered it so in reference to the trouble and expense, merely, and doubtless acted on some such view of the case. But that is not the view of the law, in the judgment of the court, where the facts show the party in the condition of Mr. Hinchman. Inquisition and the proceedings in the case are therefore set aside by the court.